UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

MEDIA.NET ADVERTISING FZ-LLC,    )
                                 )
            Plaintiff,           )
                                 )
   VS.                           )    **NO. C 14-03883**
                                 )
NETSEER, INC.,                   )
                                 )
            Defendant.           )
_____)

                         San Francisco, California
                         Monday, December 7, 2015

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    Newman + DuWors
                    1900 Powell Street, Suite 679
                    Emeryville, California 94608
               BY:  **LEEOR NETA, ATTORNEY AT LAW**

For Defendant:
                    PILLSBURY WINTHROP SHAW PITTMAN LLP
                    2550 Hanover Street
                    Palo Alto, California 94304-1115
               BY:  **VERNON H. GRANNEMAN, ATTORNEY AT LAW**
                    **BARRY K. SHELTON, ATTORNEY AT LAW**


Reported By:   Lori Stokes, CSR No. 12732, RPR
                    Pro Tem Reporter

**Monday - December 7, 2015**                              **1:40 p.m.**

**P R O C E E D I N G S**

**---000---**

THE CLERK:  Calling Case 14-03883, Media.net vs. NetSeer.

Counsel, please come to the podium and state your name for the record.

MR. NETA:  Good afternoon, Your Honor.  Leeor Neta for the plaintiff, Media.net.

THE COURT:  All right.  Thank you, Mr. Neta.

MR. GRANNEMAN:  Good afternoon, Your Honor.  Vernon Granneman appearing for the moving party and the defendant NetSeer, and with me is my partner Barry Shelton, who is here to assist with the presentation the Court requested.

THE COURT:  Educate me.

MR. SHELTON:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

I normally don't have mini tutorials and things, but I think this case raises enough issues, that it's important I understand, since I've never created my own website, other than when AOL first started and you put your name on it and a couple pictures, that's the only thing I've ever done.

So I've read the definitions, I've looked at stuff.  But just to see -- I don't know what you have in mind, but so that

I have some understanding of the relation of HTML code to CSS, what you see, what you don't see.

MR. GRANNEMAN:  Mr. Shelton has handled this with Mr. Neta, and they met and conferred, so I think I'll turn it over to him to get out of the way.

MR. SHELTON:  I was just going to say, Your Honor, first of all, it's a pleasure to appear before you.  And secondly, I actually was an electrical engineer and have been coded in HTML and CSS since the mid '90s, so I'm pleased to help the Court with the demonstration.

So we met and conferred, and we're using my laptop, which has my copy of a program called Adobe Dream Weaver, and it's just the leading web design program.

So the parties have several files to show you.  I created a web page in about five minutes for the purpose of the demonstration that has both HTML and Cascading Style Sheets.

THE COURT:  Okay.

MR. SHELTON:  So with your permission, we would like to use that laptop and show you.  So I'm going to start off with the page that I created, and then Mr. Neta has a couple --

THE COURT:  Excellent.

MR. GRANNEMAN:  Thank you, Your Honor.

MR. SHELTON:  You see on the screen in front of you a simple and kind of garish website for the purpose of making it clear how these different elements work.

And what we're looking at is what's called the live screen of Dream Weaver.  So this shows you what a web page that's being designed looks like and would look like to a person viewing it in a browser.

And for the rest of my part, I'm going to put it in this split mode, which shows the live version of the web page, that is how it would be rendered in a browser.

And then below that, the actual code that makes up the website.  And you can very easily see how changes made to the code will be reflected in what the user sees.

And I'm going to scroll in the lower code portion, and first point out that in the HyperText Markup Language or HTML, everything is in a tag.  A tag always starts with a less than symbol, and a tag is enclosed by a greater than symbol.

So we see at the very beginning -- and these are line numbers along the left side where the cursor is, so that's line 1.  That tells the browser that the document type that it has been presented with is an HTML.  And you'll notice that right under that, there's a tag that says HTML.  So that begins the portion of the HTML document.

And I note -- I've pointed out that a closing tag -- every tag has a closing tag, and a closing tag begins with a forward slash or stroke.

So if we go -- I'm going to scroll down to the very bottom.  We'll see that the very last tag is forward slash

HTML.  So that encloses the HTML portion of the document, which is, aside from that very first line, the entire document.  So this is a pretty simple web page that I constructed.

And then underneath -- right underneath -- this is on line 3 in the code -- there's a tag that's called head.

And every HTML document has two major sections, it has the head, which is a header, and that contains script.  It can contain a Cascading Style Sheet portion and can contain other code that is used by a browser, but nothing that is within head is ever visible to a user directly as content.

So in other words, if I were to type something in head, it would not be visible on the screen because HTML has defined that anything that will be visible content is within the other major section called the body.

THE COURT:  So what is that -- the head -- what's the function of that?

MR. SHELTON:  It's a header, Your Honor.  It provides what we call metadata for the browser, that is information for what is presented, and it's invisible to the user.

So I'm going to scroll down a little bit to the body.  And this starts on line 49.  And if you compare the upper live view and the lower code view, you see that the only content that is displayed on the screen is that which is in the body.

And so the first tag I want to invite the Court's

attention to is on line 51, and the opening tag says h1.

And anything that starts with h and then has a number is a heading in HTML.  So you can think of HTML as having two functions originally -- going back to 1988, originally HTML was designed to present content and also to include information about how to present that content.

In other words, the size, the font, the color and margins, so location, and things like that.  And so originally, within an HTML tag, I not only would have said h1 but included the font color, the font weight, perhaps, maybe the font family.

And so Cascading Style Sheets came around eight years later in 1996 to divorce content from its presentation because it was an absolute mess.

I first learned HTML in 1992, and it was really ugly back then because, for every single HTML tag, you would have to put all the presentation information, so color, font, et cetera.  And it made making a change to an HTML document very cumbersome and prone to errors.

**THE COURT:**  How would you have shown that in the old days?  Is there a separate line?

**MR. SHELTON:**  No, Your Honor.  One of the facets of HTML is that, within a tag, you can have other information.  So although I have here just said h1, because that's the convention today, I could -- notice as soon as I hit space, the Dream Weaver has said, what else do you want to present in

there, what other type of information.  So I can put other information about heading 1 in that.  But today it's typically not done; we take care of it through the style sheets, which I'll explain shortly.

And so within -- so everything that follows this h1 tag is considered to be a heading 1.  And notice at the very end of line 51, there's a closing h1, so it's a forward slash h1.

So let me show an example about how, within one HTML tag, you can embed other HTML.  So let's say that for some reason we wanted to give additional emphasis to "Northern District of California," I can start a new tag.

Notice this is inside h1, but I'm going to do EM, which is emphasis, which I have to tell the HTML document where that emphasis should end, so I need to have a closing tag.  And notice what it did to the screen.  Now "Northern District of California" has emphasis that is designed in HTML, notably it's in italics.

**THE COURT:**  And that's determined -- whether that's by bold, color or italics, in the old days, you would have had to specify that?

**MR. SHELTON:**  That's right.  And so the real benefit, and the reason why this HTML not only is it very simple, but the reason why it's so clean in this example is there's actually no information about how it will be presented.  That is its color, font weight, anything, inside the HTML.

That's the goal of style sheets.

And I want to point out one thing that's important.  And that is that the Cascading Style Sheets that are in issue in this case is actually not part of HTML; it's a totally different standard, and it's the leading type of style sheet. But like HTML, it has its own specification, and it's used very often today with HTML, but it's actually not part of HTML, and there's one other style sheet language I know of that's called the extensible style sheet language, and that's called XSL, but Cascading Style Sheets are far and away the dominant type of style sheet.

So now I'm going to show you what a style sheet looks like.  So, as you can imagine, the style sheet has its own HTML tag.  And so here it is on line 7 in the code view, and it's, quite understandably, set off with the tag style.

And so everything that follows the opening tag style -- you notice there it says type equals quotation text forward slash CSS end quote.  That's called a MIME type or Multipurpose Internet Multimedia Extension.  And that tells the browser what follows is, in particular, cascade style sheets.  It could also say text forward slash XSL.  But here this HTML tag is telling the browser what follows until you see forward slash style closing tag is all CSS, and the browser knows how to interpret it.

On line 8, I've included what is called a comment.  And a

comment, that is something that is there that a developer would typically place, and it's really for developers to see.

Here I've done it just to show an example of how you can have some words that are in the style section but won't be apparent to someone unless they look at the code.

In fact, everything that's within the head, as I mentioned at the outset, will never, never be seen by a user in a browser; it's invisible.

The way the comments work in the style part is that Cascading Style Sheets define a comment, this is called a C styling comment from another programming language called C.

It starts with a forward slash and an asterisk, and everything that follows until it reaches an asterisk followed by a forward slash is a comment.  And you notice that Dream Weaver is smart enough to recognize that it's not anything but a comment, so it codes that in yellow for us.

Let's look at our first style.  You see it says h1 on line 9, and then there is an opening brace, and then there are three lines that -- lines 10 through 12 that have part in yellow and part in orange and a closing brace on line 13.

Everything from lines 9 through 13 is called a style, and h1 is called a selector here.  And a selector indicates what elements in HTML in the body will have this particular style assigned automatically.

And I should mention that the reason why CSS has this word

"cascading" in it is it has very well-formed rules about how styles can be inherited.  Because most websites these days are quite complicated, and you want to very tightly control which style elements will flow down to other elements because, after all, HTML tags can be contained within other tags, and that's how websites are actually designed.

And so CSS provides these rules that specify exactly how a style will cascade or flow through subordinate elements in HTML.

Now, this is a fairly simple style I've created.  It has three parts to it.  The first, I've set the color of anything that has the h1 or heading 1 HTML tag to be -- after the pound sign FFFFFF, so that's a hexadecimal number, and it means white.

And you see that where it says, United States District Court for the Northern District of California, that's in white because I made it so.

Now, if I --

THE COURT:  You say you made it so.  You mean you chose to use that symbol?

MR. SHELTON:  Well, not that symbol, but what that hexadecimal represents is the amount of red, green and blue. So let me just backspace and change it to 00, which is the blue component, and we get now yellow.

MR. NETA:  You can also use a different unit of

measure.

Is that what you're asking, Your Honor?

THE COURT:  So there is a convention here?

MR. SHELTON:  There is a convention, yes, Your Honor, and it's actually defined within CSS.

I can also do this:  I can say black.  Now you see it's black.  I just typed black.  Sometimes designers will specify a color using hexadecimal.  I'm just so used to it, that's the way I do it.  But I could just say white and get the same effect.

THE COURT:  What if you wanted a particular shade of green?

MR. NETA:  Chartreuse?

MR. SHELTON:  That's where you specify the value. So green is the middle of that, and so let's say you want 003900.  That's some green or a lot of green.  Actually, it's kind of -- you can't -- the browsers aren't able to provide every shade because there are many possible combinations, but -- let's see.

It doesn't like that.  Oh, you know what happened, is I took off the pound sign.  So after listening to these cases about modifying loans, this is much easier and interesting.

So now let's try something like 35 and see if it can render that now.  There are limitations on what it can do, like what colors it can show.

THE COURT:  But there's a gradation there?

MR. SHELTON:  Yes.  But I've changed it to green by saying no red, full green, no blue.

THE COURT:  Right.

MR. SHELTON:  Notice I haven't touched that heading 1 content, where it says the name of the court.  And here I'm also saying the font size.  Now, there is a default font size for heading 1 that will be enforced by every browser on the planet, unless you override it like I've done.

So I can simply delete that, and notice what it did.  So that was in units of EM, which is a common font size that web designers use.

What if you wanted it even larger than that?  Why don't we say, instead of 2.7, 2.9.  See how easy it is, I'm not even near the content because the content is in the body.

I also specified a font family that will change the type face that's used.

THE COURT:  Right.

MR. SHELTON:  And I'll go kind of quickly because I can tell that you understand this.

Under heading 2, I've specified -- which is where it says San Francisco Division, I've specified yet a different font family, font style normal, given it a weight, so that would affect whether it looks bold or not, specified a different font size and told it to use the color of full saturation in red, no

green, no blue.

And so let's say I want the font weight to be 800, let's see what it does.  It changed.  Or if I say 100, notice how much lighter it is.

And then heading 3, all I've done is made that green.

And I also added one for heading 4, I made that kind of a cyan color.

THE COURT:  And the headings 1, 2, 3, and 4 are specified in HTML?

MR. SHELTON:  Yes, that's right.

And then I added another style here, that says P.  P is for the paragraph HTML element.  So any paragraph that I specify in the content will have a text color of white.

And by the way, you're probably wondering how many of these different styles there are.  There are well over 50 different styles.  I've intentionally made this pretty circumscribed for simplicity, but it gives you complete control over the presentation of the content.  That is, how will the content look and feel to a user.  But again, there's no content in this style.

THE COURT:  How about where it's located?

MR. SHELTON:  I'm so glad you asked that, Your Honor.  Because if you look at the bottom, notice under my body style here -- and that will be everything that is within the body of the HTML -- I'm saying text alignment will be

centered.  And here is where I also specify what the background color will be for all of the body.  And you notice that it's one that's specified in hexadecimal.  So I can change the background simply by typing that, and it's now a different shade.

Let's see what happens if I get rid of this text alignment.  It's going to look really ugly, I can tell you right now.  It's all fully left justified.  So let me undo that.  So that has to do with the placement.

And then finally, I created another type of style.  And notice how -- this is on line 40 of the code -- notice it starts with a period.  This means that this is what's called a class.  And it's a user-defined name.  The name is completely arbitrary.  So instead of .inset -- they're usually given a name that's kind of functional or descriptive so that later where it's used, you remember what it was.

If Your Honor gave me a word chosen at random, I could replace that.  As long as I replace the other places in the content that refer to that class, the browser would be perfectly happen.  I could also call that XYZ.  I could call it anything I want.

THE COURT:  It will then apply XYZ in the content of --

MR. SHELTON:  Yes, Your Honor.  Intentionally, I did not use that class in the content yet because I wanted to show

the Court how it's used.

Notice that what follows on line 45 is the close of the style section.  So that means no more CSS after this point.  And then right after that is forward slash head.  This is the end of the head of the document and what I called earlier the metadata.  So then we know what follows must be the body, and sure enough, there it is.

Let me go back for a moment and say what was in that inset style.  All it does is specify the left and right margin.  This again goes to your question about specifying where things are located.

And it's not used yet -- see, when I go down to the body, all that's in the body is either a tag or one comment on line 50 or content itself, the words that show up on the browser.

The reason I put this comment on line 50 is just so you can see that within HTML there's actually a tag that's defined for comment.  And so anytime the browser sees an explanation point followed by two hyphens, it knows that's a comment, and everything after that point is only a comment, it will never be rendered to a browser, up until it gets to the close of that, which this is the -- it always ends with two dashes and a greater than sign.  So you notice that doesn't show up on the screen because it's a comment.  So now let's see how to use that class name.

So after h1, notice that the third line there is class, and as soon as I double click that, it knows that it needs a name.  And notice that it also has very helpfully provided inset because that was the only class that was specified, I just have to double click it.  Notice what happened to the screen.  It gave us a 200 pixel left and right margin.

**THE COURT:**  Because you had specified that in the CSS portion?

**MR. SHELTON:**  Yes, Your Honor.

So now, let's go back to that style and let's say it looks too awful -- because I admit this is, without question, the ugliest web page I made in my career.  If we change to 100 pixels on each side, it's a little nicer.

The beauty of Cascading Style Sheets is that they're not typically in the same document as the HTML.  Whenever I had designed sites in the past, I put CSS in the file, because typically sites are made up of more than one page.

So you put all your CSS in one file, get it right there, and then at the top in that head section, you import the style sheet from elsewhere.  And you can even import style sheets from, you know, other sites or what have you, and it pulls it in for the purpose of this one.

So what's nice about that, within your web pages, all you have is HTML, and all you have is content.  And the presentation of that content is defined elsewhere.

**THE COURT:** So when you use inset, it's got to refer back to the inset used in CSS, whether it's h1 or h2, you have to make sure you're drawing from the right style?

**MR. SHELTON:** That's correct, Your Honor. Yes, that's right.

And by the way, if there's no style defined -- so there's another heading 5 I could have used or I could have omitted -- let's see what happens if I completely delete a style for P.

Because I do have a paragraph down below. So I'm just going to delete that, and now let's see what it did to the page.

Notice where it says this is a web page constructed, that's now really ugly given the background. It's in black, and it has a pretty small font. Because if you don't have a style defined for that, guess what you get? You get whatever --

**THE COURT:** It defaults to.

**MR. SHELTON:** Yes, correct.

So if you import a Cascading Style Sheet from another file, to the extent that there's not a style defined for a particular HTML element, the browser knows what to do. It will use its default that was decided long ago in the late '80s.

So, Your Honor, unless you have further questions, that concludes my portion of it.

**MR. NETA:** And if you will indulge me, Your Honor, I

will take a few minutes to show you a couple other distinctions, if that's all right.

THE COURT:  That's fine.  Thank you.

MR. NETA:  So we were working this weekend to try to create some pages to describe how websites are created, I thought it might be helpful for you to take a look at a couple of websites that look, in fact, identical in terms of content, Your Honor.

As you'll see when I hit these tabs, all of these websites are -- in terms of content -- exactly the same.  They have the same text, same boxes, same hyperlinks.

But precisely as Mr. Shelton demonstrated earlier with respect to the split screen and code section, the code section below is dramatically different.

Yes, there's still a header; yes, there's still a body, in some cases there's also a footer, but the text is written very differently.

THE COURT:  So what's an example if you take any one of those headers or something as to multiple ways that you can reach that through the different HTML or CSS?

MR. NETA:  It might be helpful, Your Honor, if I give you -- if you'll indulge me some more -- written copies of the code for these different versions.  And I've labeled them at the top Version One, Two, Three, Four.  And as you look at those documents, they're not very long, you'll see they

actually look quite different.

The text is the same, but the comments are very different. And the descriptors, like what Mr. Shelton described earlier, the .inset, there are a lot more of those, and they're described in completely arbitrary ways.

If you look, for example, at Version Three, on line 31, instead of saying CSS for sponsored links, I've written CSS for famous composers, and I changed all the names of the descriptors that follow to name them after famous composers, Mozart, Beethoven, Bach, et cetera, et cetera, and it has had no impact whatsoever on the page.

Same with Version Four.  Except what I've done is I've changed the comment on line 31 to say Judge Chen's Wikipedia page, and I've changed all the arbitrary descriptors to lines of text from your Wikipedia page.  In fact, it more or less reads like your Wikipedia page with the inclusion of some of these predetermined descriptors.

So some of what you see in CSS, Your Honor, is predetermined, you have to use a certain word or phrase, like color, like width, like height, and some of what you use can be whatever it is you want.

And I'm happy to explain to you when we get into further argument, one of the things that their expert identified in deposition was that those unique factors, those unique descriptors, and certainly the comments, are intended to

communicate to the reader and future editors something of what the author was thinking when they created the site. What they intended, what they wanted it to be used for. Sometimes they used comments to say, this is very important, do not change this.

So in reality, through that process, the author of these unique descriptors and comments, the author is communicating with the reader. Maybe not the reader of the website content, for which all of this is imperceptible, but certainly future editors of the code and future readers of the code.

**THE COURT:** Well, the comments, I understand, can have sort of a typical literary content in any one sense, but when you use different descriptors, whether you call something ABC or XYZ, when it refers to the same blocks, it allows you to apply the CSS to whatever it is, what's -- I mean, what's the function of that other than you've got to call it something?

**MR. NETA:** Sure, you have to call it something, but you can call it whatever you want, and you can be completely creative about it.

In the case of the code that was registered in this case, we called it spons-link or inner-spons-link, but we could have called it whatever we wanted to. We could have called it Leeor Neta's favorite term. It could have been whatever we wanted.

**THE COURT:** Okay. Well, this is helpful. So let's talk about the case. Thank you for that presentation.

**MR. SHELTON:**  You're welcome, Your Honor.

**THE COURT:**  It was enlightening.

First of all, I take it nobody is taking issue with the kind of deference that should be given to the compendium.  I mean, we're all working off of it and interpreting it, but nobody is saying that thing is just way off, it violates a statute or something, it's not consistent with the Copyright Act.

**MR. NETA:**  No, we're not saying it's not consistent with the Copyright Act, Your Honor.  We're just saying that, as it stands, there's been some confusion in terms of what is copyrightable and what is not copyrightable.

And it was very much my understanding while I was deposing their expert that there was a fundamental misunderstanding on the expert's part about what is copyrightable.  And he kept communicating this notion that something must be perceptible to the website user to be copyrightable, and that's simply not what the compendium says.

**THE COURT:**  Let me tell you how I see things, and you can tell me if you fundamentally disagree, and we can talk about -- kind of drill down.

It is reasonably clear to me when I read the compendium that in describing HTML code and what is copyrightable, a distinction is made between the code itself and the words and numbers and text that make up that code and what appears on an

actual web page or screen display.

The latter is not copyrightable for a lot of the reasons that it goes into.  You cannot copyright -- just like you can't copyright the general layout of a book title or something because you're going to -- pretty soon, you'll preempt everybody else from having similar-looking things, and that's not good for competition.

But that doesn't mean that the underlying code is not copyrightable.  In fact, the compendium suggests that may be registered as a literary work.  So I agree it's not what's perceptible to the visual user on the web page, maybe what's perceptible to the web developer and it may get into the metadata and the HTML, but what displays on the page is different.

On the other hand, it does say -- Section 1006.18 does say that to be registered as a literary work, it must contain, quote, a sufficient amount of creative expression.

**MR. NETA:**  That's correct.

**THE COURT:**  And so, you know, one question arises, and maybe you sort of answered this, is if you have a certain look and feel on a visible display of a web page, and if there are only one way to write that code to get there, then they're almost synonomous, and there wouldn't be a whole lot of creative expression because there's only one way to get there and the thing you're getting is not copyrightable, so there

isn't much creativity.

On the other hand, if there are a thousand ways of getting there, one could argue you have some free rein in choosing the code, methodology, layout to get there.  Even if the ultimate result that's displayed is not copyrightable, the underlying code to get there may be if it contains a sufficient amount of creative expression.

So one question I had is, are there multiple ways to get the same look and feel and content -- multiple ways of writing code?

MR. NETA:  Yes, there are, Your Honor.  I hope that was demonstrated by the four versions of codes that I presented to you that are in very different lengths, have very different comments, very different descriptors, and are designed in completely different ways.

I'll also bring up what Mr. Shelton pointed out earlier, this notion that CSS can appear in line with HTML, it can appear totally separate on the page, it can be on a separate section.  And, most commonly, it can be produced on a completely different location so that you can have a reference to CSS that is located separately.  And those are all different ways of designing the page.

In fact, Westlaw's login sheet page doesn't have any CSS on it.  If you view source, you'll see that there's just a reference to it elsewhere, and it takes you to another location

where all the CSS is found, and actually, it has a copyright symbol there at the top, which is kind of interesting.

So there are literally thousands of ways that people can do this.  And I think what the copyright office was speaking to, they want to make sure that authors of websites are not copyrighting methods of operation, such that I can't create a site that has a blue screen and a box and prevent everyone else from doing so.  The fact that you can write that code in a creative way, somebody else can reach the same result, that's fine, so long as they're not using the exact same iteration of code.

**MR. GRANNEMAN:**  Your Honor, one of the reasons I think the compendium -- speaking to Cascading Style Sheets, saying that a Cascading Style Sheet is generally not going to be copyrightable at all -- first of all, the compendium applies to website content, which includes the underlying markup.

The underlying markup, the CSS, controls the layout, format and look and feel of the content that is presented. So -- which the copyright office has expressly said, consistent with case law leading up to it, which we've cited in our briefs, that that's why the look and feel is not protectable in copyright.

Now, what Mr. Neta is saying about these descriptors and comments going in there and his characterization of what Mr. Tittel said in his deposition, I think if you go to -- I

think it's paragraphs 6 and 7 of Mr. Tittel's supplemental declaration that we filed with our reply, this started as a list of -- with two exhibits to the original complaint, the same two exhibits to the amended complaint, roughly 25, 30 pages of what was represented to be HTML source code.

I think, when Mr. Neta is talking about the descriptors or these class names and the comments, it all boils down to a chart that appears on paragraphs -- in paragraph 6, I think, of Mr. Tittel's declaration --

**THE COURT:**  Supplemental declaration?

**MR. GRANNEMAN:**  The supplemental declaration.

That lists those exact names.  And the underlying -- and the four comments that relate to that.

All of those, I think, are not copyrightable, as we've pointed out and cited authority for, because they comprise names, short phrases and the like that are not copyrightable under the Code of Federal Regulations.

But more to the practical point, those names don't influence the variable names, for example, or the descriptor names or class names, however they're defined.  They don't affect how content is displayed on the page.

And I think that's what Mr. Neta conceded just a moment ago.  They don't have any -- they have no effect on the display of content.  If you changed any of those names to any other word, the content that gets displayed would be the same.

And you saw his example in the -- in this web page that he's got, which is one of an ad example. I think it's taken partly from Exhibit D to the complaint, but it is an example of one of the ads. And what you see is that basically four pieces of advertiser information gets displayed in a box.

What the majority of the CSS does is it applies style to that box. It determines the size of the box, the -- and boxes within boxes. When you're talking about an inner-spons-link, for example, that is a -- that is an inset into a spons-link link box so that you can display the URL to the website, a description of that, the title of that ad.

And in the CSS, what it's simply doing is assigning pixel size, font, color, you know, emphasis, italics and those sorts of things to the contents supplied by somebody else.

And the names that are being assigned to the different classes, whether it's the box that's the inner-spons-link, it's the spons-link, it's ad wrap, which simply means --

THE COURT: Which ties the HTML to the CSS style specification?

MR. GRANNEMAN: Yes.

MR. NETA: It calls up the CSS in the HTML, but it's not CSS itself.

THE COURT: So you assign it some name, like you said, you call it ABC or XYZ, but once it sees that, it will call up the CSS style and it will create that font, that color,

et cetera?

**MR. NETA:**  Right.  The point I was just trying to make, Your Honor, is that when it appears -- it calls it up in the HTML, that is not actually CSS.  The CSS is separate.

**THE COURT:**  I understand that.  And you're saying, as I understand, part of the creativity is what name you call that theme that also finds itself in CSS.

And he's saying it doesn't make any difference.  You can call it ABC or XYZ, so long as they align, you can call it popcorn or whatever.

**MR. GRANNEMAN:**  It's the short little placeholder for information.  That's all it is.  It's a placeholder.  It could be anything.  It's hard to imagine how there could be creativity in the choice of a short phrase or a title that would -- that could simply be replaced by anything and only has the effect of categorizing groups of information that come in from advertisers and say, if it's the inner-spons-link group of information then it gets this style.

And the comments are little more than instructions on how to use -- they don't -- they're ignored when a web page gets rendered.  The comments are invisible.  And then more fundamentally --

**THE COURT:**  Although, that's not necessarily true. The fact -- I agree.  The fact that it's not visible to the open consumer doesn't make it uncopyrightable.  That's not the

criteria.  Because the very fact the compendium contemplates the HTML, much of which is not visible to the layperson who is looking at this -- and the compendium expressly divorces the display part from the underlying code, that strongly suggests to me just because you can't see it and it doesn't have any direct effect or change, for instance, on the display, doesn't mean it's not copyrightable.

             **MR. NETA:**  That's precisely right, Your Honor.

             **MR. GRANNEMAN:**  But the question is this:  If it's not perceptible to the user, how does it -- first of all, I do think we've cited the portion of the compendium where we talk about to be copyrightable it has to be perceptible to the user.

      But the point is, if it's not perceptible to the user, how can there be any actionable infringement?

      If no one sees it, it isn't like we went out to try to get these class names and comments on the New York Times Best Seller's list.  They simply dictate -- they're a part of the CSS that dictates --

             **THE COURT:**  Well, by your argument, HTML should never be -- when would HTML ever be copyrightable and infringed?

             **MR. GRANNEMAN:**  Well, for example, if you embed something in the HTML --

             **THE COURT:**  Well, that's the content itself.  The compendium makes that clear.  If you embed, a novel, yeah --

**MR. NETA:**  That's true, Your Honor.  Because actually --

**THE COURT:**  Hold on.  That's not what it says.  It says -- the code itself extends to the code and/or accompanying text.  Will extend to text that is embedded but does not extend to formatting and layout of text or digital files on a web page.

**MR. GRANNEMAN:**  But in this case, what was copied of CSS, that's all it does.  All it does is format and lay out the text or content provided by somebody else on a web page. That's all it does.

And the class names --

**THE COURT:**  All what does?

**MR. GRANNEMAN:**  Well, the CSS part, the style part, the font, the weight, the width, you don't have all these little elements in this example that was given to you, but you do in this.

**THE COURT:**  Right.

**MR. GRANNEMAN:**  All of those things simply determine the layout of information that gets displayed on the page.

So that's why I think the compendium was correctly saying you're talking about layout and format of web pages.  We're not going to give somebody a preemptive right as Your Honor said or exclusive rights to position text on a web page or on a portion of a web page with -- in a box that's 900 pixels.

So if our box is 899 pixels, are we not infringing?  I mean, that's the point.  There are a lot of ways to do this, but what you end up with is you're really looking at, in this example, in this case, taking three or four pieces of advertiser information and figuring out where they get displayed on a web page.  And that's what the CSS does.  It's all it does.

THE COURT:  Well, isn't their argument that it's not just CSS, that --

MR. GRANNEMAN:  But what's the HTML then?  What is the HTML that they're claiming?  There's two things, there's an HTML tag that Mr. Shelton talked about that starts the style portion of the document and closes out.  But the point is, within that portion of the -- and that's what got copied.

So within that, it's just the CSS.  The only argument can be these class names or descriptors and comments are extra.  Are those HTML?  No, they're not HTML.  They're just names.

THE COURT:  Well, let me make sure I understand factually.  You're saying that the only thing that was copied is bracketed in the style portion of the HTML?

MR. GRANNEMAN:  Correct.  That's all that got copied.

MR. NETA:  May I speak to that issue, Your Honor?

THE COURT:  Yeah.

MR. NETA:  This is a motion that asks the Court to

invalidate a copyright in HTML. And specifically, in advance of this motion, filing this motion, in advance of our filing our response, we made it very clear -- they made it very clear -- they are not litigating the issue of who copied what.

Infringement, whether they infringed, to what extent they infringed, what they took, what they didn't take is simply not at issue today. And if it were, we would have taken a host of discovery on that issue. But we didn't. Because we received Mr. Granneman's assurance that that was not at issue in this motion. What is at issue in this motion is whether or not our copyright is valid.

And to determine that, you need to look at the materials that we actually copy wrote. And it doesn't matter what they copied or what they didn't copy.

**THE COURT:** Well, would you agree that everything within the style portion which is CSS is not copyrightable?

**MR. NETA:** Not necessarily, Your Honor. If you actually look to the language of the compendium itself, it says the Office, quote, generally will refuse to register claims based solely on CSS.

Now, as a threshold issue, Your Honor, I can tell you -- I'm reading from 1007.4.

As a threshold issue, Your Honor, the materials that we submitted are not solely CSS. In terms of just line numbers and page numbers, I'd say it's about half CSS. The rest is not

CSS decidedly so.  And that was confirmed when we deposed their expert in Austin.

Now, the reason why the Office generally will refuse to register a claim based solely on CSS is because oftentimes CSS doesn't include unique creative descriptors like .inset or .inner-spons-link or -- it could just be h1, h2, h3, body, paragraph.

And the difference here, Your Honor, is something we talked about during the deposition of their expert.  This notion of what is a predetermined term, like color, like width, like height.

And a user-defined term, which can be, as we discussed, Your Honor, anything we want.  Now, commonly, you can create a CSS, Cascading Style Sheet, with no unique creative descriptors at all, no comments, only predetermined terms.  And I think in that instance, I would have to admit, the Office would not register such a claim.

But there are two issues, as I said, the threshold issue, more than half the code, if not at least half, is certainly not CSS.

THE COURT:  So what's an example of what is not CSS, not within the style?

MR. NETA:  Can I show you another paper example, Your Honor?  And I have a copy for you too, Vernon, if you'd like.  These are paper copies of the materials that we

submitted when we applied for the copyrights.  One is marked with the term "Original," and one is marked with the term "Revised."  There are two copyrights at issue in this case.

**THE COURT:**  How does this relate to Exhibits C and D in the complaint?

**MR. NETA:**  They're identical.  You'll see the docket numbers at the top indicating these were filed by Mr. Granneman in support of his motion.  I just pulled them up and made a couple of notations on them in pen.

On page 1, you'll see --

**THE COURT:**  Page 1 of?

**MR. NETA:**  Of Original.  You'll see there's an arrow with highlight, and it points to bracket style, right.  That's where the CSS, Cascading Style Sheet, begins.

**THE COURT:**  Yes.

**MR. NETA:**  If you skip ahead to page 6, you'll see there's another arrow highlighted with a bracket slash CSS.

**THE COURT:**  End of style.

**MR. NETA:**  End of style.  That's where the style ends.

**THE COURT:**  Yes.

**MR. NETA:**  Your Honor, everything that follows is not CSS.

I've similarly demarcated the second document, which is our revised Media.net results page, the second copyright, and

you'll see where the style sheet begins, where the style sheet ends.

Now, again, Your Honor, it doesn't matter what they copied or didn't copy for purposes of this motion; what matters is, did we register a claim in copyright for materials that are solely CSS.  And the fact is we did not.

THE COURT:  Well, that doesn't answer the question whether the entirety of this document -- if I were to say, yes, we're not going to disqualify the entire document, that doesn't mean that the entire document contains -- everything in here is copyrightable material.

You would agree that everything -- would you agree that everything between the first two arrows, which is your CSS, although the entire document includes a lot of other stuff, that portion is not copyrightable?

MR. NETA:  No, I would not, Your Honor.

THE COURT:  Why?

MR. NETA:  Because the second issue I described, within those two indicators, there are plenty of comments, and there are plenty of unique creative descriptors that can be whatever I want them to be.

THE COURT:  Which then later sets up for the later reference back in the HTML body?

MR. NETA:  Sure.  So what you're saying, Your Honor --

THE COURT:  Is that the only thing that's creative here is comments and the names of descriptors?

MR. NETA:  No.

THE COURT:  What else is creative?

MR. NETA:  Plenty of the comments could be removed entirely, they could be renamed entirely.  A lot of the nonfunctional elements that just communicate intent, like these descriptors, they're not driven by HTML, they're not required for functionality.  Importantly, the descriptors can appear in any order.  The attributes can be freely reordered up and down however you like.

I could, as Mr. Shelton pointed out earlier, use an entirely different syntax, like HTML5 or something else.

THE COURT:  What do you mean?

MR. NETA:  I could have used an entirely different language to communicate this syntax.

THE COURT:  In the style sheet?

MR. NETA:  In the code.  I could have used it within the style --

THE COURT:  What do you mean by that?  Can you give me an example?

MR. NETA:  Yes, I can.

I appreciate your patience, Your Honor.

THE COURT:  Sure.

MR. NETA:  There are special handling

characteristics within the code that don't even need to be in HTML, and I queried Mr. Tittel about that during our deposition. One of these has to do with whether or not, you know, boxes have rounded corners or square corners.

And I said:

"Q. These don't even need to be in HTML in order to provide rounded corners, or they don't need to be provided specifically with respect to each browser?"

"A. The HTML5 versions of documents can specify rounded corners without using these -- well, let's call them workrooms, but if you wanted to stick with an HTML4 base syntax or an HXTML syntax, you would still have to use this notation."

So right there, Mr. Tittel confesses that we could use entirely different syntax to communicate all of this.

THE COURT: When you say syntax, what do you mean by that?

MR. NETA: The language that is used to communicate all of these terms. And that's why, if you look at Version One of what I sent you and Version Two, you'll see that those materials look very different.

Still in HTML, but you can organize a page and make it look dramatically different in terms of its code when you print it out, and it will still be totally imperceptible to the user.

What's been frustrating me, Your Honor, since the outset and since the filing of their motion is this feeling I have that defense counsel is conflating these two principles.

As you precisely said, there are three layers of copyrightable content on the website. There's what is perceptible to the user, the website content. That can include pictures and text and photographs and videos and music and audio files.

And then there's HTML that underlies the page. It is not perceptible, and it is copyrightable, and here is why: Because you can write it in countless different ways so long as you're not preventing someone from producing the output that itself is not copyrightable.

In fact, the compendium says that if you want to get a copyright on anything that's perceptible on the page, there's no reason to submit the HTML code. Why would the compendium say that?

THE COURT:  Say that again.

MR. NETA:  Sure.  This is a quote from the compendium.

THE COURT:  Which section?

MR. NETA:  1006.1A.

If an applicant intends to register the text within a website, the applicant should submit the text as it is rendered on the web page. There is no reason to submit the HTML code.

What has been frustrating, Your Honor, is this notion that I'm understanding from defense counsel that you can only register what's perceptible.  But that's not true.  And, in fact, the compendium states, if you want to register something that's text, don't submit HTML code.

So why would we ever submit HTML code?  Because you absolutely can copyright something that is imperceptible, like any of this theses of code, so long as you're not foreclosing an output that is itself copyrighted.

**THE COURT:**  You're saying since there are infinite number of ways to use descriptors and have comments, you could get the same result through a number of ways; therefore, allowing copyright of this particular version does not foreclose somebody coming up with a different way of --

**MR. NETA:**  That's precisely right.  And I'll tell you right now, Your Honor, that Media.net has countless competitors that do just that.  They just don't copy our code.

And when Mr. Shelton and I were meeting and conferring about the page that he presented earlier today, the first iteration they sent me didn't have any arbitrary descriptors or comments in it at all.

And I would submit that a page like that, as I said, would probably -- the code would probably not be copyrightable because it's so simple.

But pages like this, even though they appear simple, that

have complex code, the code itself is absolutely copyrightable. And the reason why, the author wants to perceive the creative component of naming all of these descriptors in unique ways and the combination in which they've done it.

There is binding Ninth Circuit -- well.  Yeah, binding Ninth Circuit precedent indicating that a combination of non-copyrightable elements, if done in a unique way, is absolutely copyrightable.

**THE COURT:**  So if they had taken your code and added the letter B in front of each spons-link, wrapper, et cetera, all the descriptors, called it something different, okay --

**MR. NETA:**  We'd have a separate discussion then about this context of infringement, but that doesn't mean that our copyright isn't valid, right?

**THE COURT:**  Well, you know --

**MR. NETA:**  I could take a copy of --

**THE COURT:**  The whole idea of this is not to allow somebody to preemptively stifle creativity by taking, you know -- so to illustrate your point, since there are an infinite number of ways of writing code, if you put a B in front of every descriptor, take out the comments, put their own comments in, no infringement.

**MR. NETA:**  I would submit that it's premature to get to that point, Your Honor, in terms of what the scope of infringement is.  But what they're asking you right now is to

invalidate a copyright.

And I would say to you, if I were to take a copy of Slaughterhouse-Five and add the letter Z at the beginning of each sentence, is that copyright infringement?  I don't know if it's germane to our discussion today.  Frankly, does that invalidate Kurt Vonnegut's or the publisher's copyright of that book?  Probably not.

**MR. GRANNEMAN:**  Your Honor, a couple of things to sort of go back here.

Mr. Neta was talking about the fact that his approach to this motion was predicated on some agreement by me that the issue of what was copied was not at issue on this motion. That's just false.

It was apparent from our initial moving papers that -- and it's been apparent from our answer to the complaint, the original complaint, that all that was copied here is the style sheet.  That is it.  We have given them sworn discovery responses that showed exactly what was copied.

**THE COURT:**  Well, let's say that is true for a moment.  The question of copyright-ability and validity is a different question.  And what they have submitted is not just pure CSS.

You may argue at a later stage that -- to the extent that the only infringement has to do with everything within CSS and your view that CSS, even with arbitrary descriptors, is not

copyrightable.  You know, that's sort of stage two.

**MR. GRANNEMAN:**  Let me respond to that, please.

Everything that's within the CSS here is -- if you look at this, we have done a comparison of Mr. Tittel's original declaration.  We took the CSS out of Exhibit D and the allegations of -- I think it's paragraph 47, whatever the lengthy tables --

**THE COURT:**  47 in the complaint?

**MR. GRANNEMAN:**  Yes.  Well...

It's paragraph 47 of the amended complaint.  As you can see, first of all, what they focus on is comparing what was copied, it begins with -- it begins and ends with the style sheet.

If you go from page 7 of the document through 13 of 22, this is all the style sheet.  That's all this is in here.  That's what Mr. -- when Mr. Tittel did his original declaration, he did Appendix D to the declaration, which does two things.

It provides a description of kind of the structure of an HTML document, and he compared the -- what was copied between Exhibits C and D and Exhibit E, which was a printout of NetSeer's search results page.

They went -- apparently, Media.net went in -- or counsel went in -- and revealed the underlying style sheet that NetSeer used and then copied that and attached it to the complaint as

Exhibit E.

There is no allegation that we copied anything other than the style sheet.  There just isn't any.  And when they attached Exhibit E to the complaint, if you simply compare Exhibit E to Exhibit D as an example, you will see the only duplication is the style sheet.

There's no evidence -- there's nothing before the Court at this point and nothing in the allegations of this complaint that talks about us copying anything else.

The other thing that is -- you know, it's been frustrating that Media.net won't clearly state what they claim is copyrightable.

And this -- when you get to the end of this -- take the revised Media.net results page that Mr. Neta just handed you and marked number two, this is Exhibit D to the First Amended Complaint.

When I get to the end of the style sheet into the head of the document, what you're seeing from here on out are actually -- is simply the underlying code that gets spewed out by a machine that is -- that's the result of the displayed ad results.

These are ten ad results for vacations in India.  And all of this is not HTML.  This is stuff generated by the web browser when it prints it out.

If this is -- and, in fact, if this is what was actually

submitted to the copyright office when they tried to get their copyright applications, it's very curious that their expert Dr. Mitchell never mentions this in his declaration.  He just talks about something that was submitted to the copyright office.

**MR. NETA:**  I would submit, Your Honor, they're the same thing, he just didn't use that terminology.

**MR. GRANNEMAN:**  Well, it's interesting to try to understand Dr. Mitchell's declaration, then, without some reference as to exactly what he was looking at.

**THE COURT:**  Well, assuming that he's referring to C and D in its entirety --

**MR. GRANNEMAN:**  And if you look at Exhibit 2 to his declaration, when he talks about the comparison of the codes, it's all style sheet.  That's all it is.  I think if you look at Exhibit 2 --

**THE COURT:**  Exhibit 2 to his declaration?

**MR. GRANNEMAN:**  Yes.  Yes, Exhibit 2 to his declaration is a comparison that he talks about between the two -- this is a comparison, I think, probably, of just -- I don't remember from reading his declaration, it is what he says it is.  But it's more than likely a comparison of Exhibit E to the complaint, which is the NetSeer search results and Exhibit D, which is their revised search results.

But this is all CSS.  None of this -- none of this that

he's opining about is -- is HTML, except for the opening, which is a standard HTML tag, style type equals text CSS and then the closing back slash style.

MR. NETA:  Your Honor, that's simply not true, and that's not what their expert said under oath when he was deposed.  I asked him specifically about this section starting from page 6 or 7 after the end style bracket whether or not it was CSS.  He said it was not CSS.

And he said, in fact, and I quote, well, there are no CSS -- well, there are -- it's unlikely that, unless there's some inlying CSS, that there would be any further CSS definitions.  There are plenty of references to CSS in the HTML markup.

And then he goes on, and he reviews it, and he says, So it's not -- and I asked:

"Q.  So it's not CSS, per se?

"A.  No, sir."

Later on, I asked him if it consists entirely of letters and numbers, which is exactly what the compendium says HTML is, and he says it does.

MR. GRANNEMAN:  Your Honor, Mr. Tittel covers this in his declaration.  This is a machine-generated set of results of searches.

Yes, if you go down, there's more -- the CSS reappears.  I mean, for example --

THE COURT:  Where does it reappear?

MR. GRANNEMAN:  Well, if you look, the references to these like inner spons-link.

THE COURT:  Are you in E?  Are you in the revised?

MR. GRANNEMAN:  This would be Exhibit D to the complaint.

THE COURT:  Yeah.  So where are you looking?

MR. GRANNEMAN:  If you go below, it helps define the boxes where it says div class wrapper -- just go below the style closing tag on page -- I'm looking at page 7 of 14.  This document has been filed twice.

Then you go down below by sponsored listings for, this is a repeat -- all it simply does is it's showing you how the style was getting applied to the content.  And the content then is, for example, vacation in India, which is highlighted on that page.

All this is showing is how the style is getting applied. These are machine-generated results, and that's the proof, and they didn't dispute that.

MR. NETA:  Can I ask you, Vernon, what page you're on?

MR. GRANNEMAN:  Page 7 of 14.

THE COURT:  7 of 14 of D.

MR. NETA:  Yes, Your Honor.  I specifically went over this with Mr. Tittel during his deposition, as well.  I

referenced that section of the code.  I pointed out that there were these unique and creative descriptors that also appeared within that, and I asked:  Does that suggest that this is CSS?  He said:  No, it's making reference to CSS; it is not CSS markup.

MR. GRANNEMAN:  Which is right.  It's not CSS markup; it is the references to it that shows that style is being applied to those things.

Your Honor, what this is boiling down to is Mr. Neta is effectively conceding what's creative in his style sheet are these 12 or 13 class names and four comments.

That's what's in Exhibit 6 to Mr. Tittel's supplemental declaration, is all that is even arguably protectable here.  And then I get to the question of how do -- if something is not even seen by anyone, how can there be some actionable infringement?  They can't --

THE COURT:  Well, that's a different argument.  You're suggesting as long as HTML -- forget all this machine-generated -- if somebody actually generated an HTML code and produced exactly the same thing, you're saying that's not copyrightable; it's only style sheets.  It actually has HTML code.  You're saying because the code itself can't be seen, that it's not copyrightable.

MR. GRANNEMAN:  No, I'm not saying it's not copyrightable.  But even if there were something in there that

were copyrightable, the other question here is there's a motion to dismiss too.

How plausible is it that something -- somebody who doesn't see -- how can there be harm from someone who can't see the class name, for example?  Inner-spons-link, which could again be anything.  It could be any word.

THE COURT:  Well, whether there can be harm and what the causal effect is, that may be a separate issue.  That may be fact dependent on the case.  It doesn't answer the question whether it's copyrightable.

It may be copyrightable but it may be hard to prove damages -- for instance, if you can show that they copied it, but even if they hadn't copied it, it would take two seconds to come up with their own way of getting the same result, it's pretty hard to show causally-related damages in that situation.

In this case, they're going to say, well, it took us hundreds of hours to come up with this code, and it couldn't have been reproduced very easily in time to compete on the Microsoft thing, and that's why we got screwed in the process.

That doesn't answer the question -- you're conflating what is copyrightable and whether there can be damage from it.  I admit that the whole thing, at first glance, it's not easy to find damages where what you're talking about is an underlying code to produce the same result, which the result itself is not copyrightable, what's the harm.

But maybe -- in certain instances -- maybe this is one of them -- where you ended up saving hours of research, and in a very weird, competitive situation, it gets your client's foot in the door they otherwise wouldn't have had they not copied. I don't know.  That's the argument they're going to have.

MR. GRANNEMAN:  Then let me back up because again, the evidence before the Court today is all that was copied is the style sheet.  That's it.  None of the rest --

THE COURT:  Let me ask.  I mean, looking at paragraph 47 --

MR. NETA:  That starts off with the language, the following table shows several examples of NetSeer's infringement.

THE COURT:  So this is not to be exhaustive?

MR. NETA:  Of course not, Your Honor.  We don't know how much they infringed.  We have an idea --

THE COURT:  Well, do you agree that the examples given here are all within the style sheet?

MR. NETA:  I appreciate your indulgence again, Your Honor.

I believe that might be the case.  Though, I will say that these are just examples.  And there are numerous comments, exclamation, important, stroke, asterisk, search form, CSS and numerous, numerous arbitrary descriptors that were creatively defined by the author however they wanted.

THE COURT:  So why wouldn't -- I understand this was not meant to be an exhaustive list, but why wouldn't it be appropriate for the Court to opine as to whether at least these examples fall within the side of copyrightable or not?

Your argument is so what if there's still creativity in descriptors, in comments.  I guess your expert argues that CSS can be creative.

MR. NETA:  Absolutely.

THE COURT:  So why shouldn't I, to advance this litigation, address that issue?  Because if I rule one way, that says one thing.  If I rule the other way, you may well have to come back and say I need to redo this complaint and find something that is protectable?

MR. NETA:  Couple of points.  Generally, challenges to copyright-ability are based on a functionality argument.  They're treated as affirmative defenses to infringement.

So as an initial matter, I don't even know if it's appropriate to make that determination about what's copyrightable, what's not copyrightable within this context before we get into that question of what is infringing.

But --

THE COURT:  Well, for example, if they move to strike paragraph 47 on the grounds that everything you've alleged in there is not subject to copyright protection, if it can be determined as a matter of law, I don't see how it's

inappropriate to issue a ruling on that.

**MR. NETA:**  I would submit that there are a couple of points I would make in response to that, Your Honor.  First, there's a very low bar for creative expression.  The Supreme Court has said on numerous occasions that all you need is some minimal degree of creativity.  The requisite level of creativity can be extremely low, a slight amount of creative expression will suffice, and the vast majority of works make the grade quite easily.

So even though Mr. Granneman is taking these elements out one by one and saying -- and wants to look at them in isolation and say, in isolation, they are not copyrightable, they're just terms, they're just names; in reality, the bar is very low, and it's the compilation of those terms that provides a protectable quality.

If I may, I'll read quickly from case Apple Computer, Inc. versus Microsoft Corp.  That Court illustrated the danger of overlooking this aspect of copyright law with an astute hypothetical.

Suppose Defendant copied Plaintiff's abstract painting composed entirely of geometric forms arranged in an original pattern.  The alleged infringer could argue that each expressive element, the geometric forms, are unprotectable under the functionality merger and unoriginality theories, and thus all elements should be excluded prior to the substantial

similarity of expression analysis.  Then there would be nothing left for purposes of determining substantial similarity of expression.

In this example, elimination of unprotectable elements will result in a finding of no copyright infringement, which would be inconsistent with the copyright law's purpose, providing incentives to authors of original works.

**THE COURT:**  Well, that's because the amalgam of shapes is -- results in something different.

If here the basic rule is that methods of formatting and laying out the organization of documents written in a language such as HTML is not protectable, the fact that you've used -- denominated certain descriptors in order to, as a quote, placeholder, to work hand in hand with HTML, I'm not sure that takes it out of the realm of procedures, processes and methods of operation.

**MR. NETA:**  That is if we're not conflating those two terms about website content versus HTML.  If you just look at the HTML on the screen, it does look different.

Set aside website content for a minute.  I can move those terms around, I can call them whatever I want, I can place them wherever I want.  It doesn't matter --

**THE COURT:**  I'm not talking about the style sheets; I'm talking about paragraph 47 in your complaint, which appears to only cite, as an example, copying, which comes from the

style sheets not into the HTML body.

MR. NETA:  Right.

THE COURT:  And so my question is:  Not necessarily ruling on the rest, but it would advance this litigation if we were to determine whether that's protectable or not.  If it's not protectable, we don't have to spend a lot of time on this. We can go on, and I may force you to say, well, show me what's the element if I have to go through the extraction, filtration and comparison test, we've got to set that up.

But -- so that's what I'm talking about.  And the fact that the Cascading Style Sheets, those portions that are cited in paragraph 47, even though there are arbitrary descriptors given to it, I'm not sure that takes it out of the general gist of Section 1007.4 of the compendium.

MR. NETA:  In other words, layout and format.

I would submit, Your Honor, that these terms can be whatever you want, they could have named them whatever you want, and that's precisely why I gave you those four examples today.

They could be written however Media.net wanted to.  And maybe Media.net has an interest in ensuring that those terms ordered in that fashion aren't going to be copied or infringed upon by anyone else.

And that's why I think it's not appropriate to say if we're just talking -- let's just remove the CSS entirely.  The

compendium only states that the Office will generally refuse to register claims based only on CSS because they say that procedures, processes, methods of operation are not copyrightable.

But these terms, whenever I put a dot in front of something and make it a user-defined term, that's not a method of operation.  That's simply just whatever it is I want to call it.

What I would submit as the distinction, Your Honor, is this:  And I know there's been a couple of things conflated, so I think here is the difference:  When we deposed Mr. Tittel -- and I've had a number of conversations with my expert about this -- I believe strongly that this is the distinction:  There are predetermined terms, like color, width, height, font size. Those are not copyrightable because they're methods of operation, they're methods of defining color, width, height.

But any user-defined terms, those are copyrightable.  And that's the distinction.  Are you trying to copyright something that just has predetermined terms in it, or are you copyrighting something that has a wealth of user-defined terms, and that those user-defined terms are ordered and organized in a unique fashion.

MR. GRANNEMAN:  May I respond, please?

THE COURT:  Yeah.

MR. GRANNEMAN:  In Footnote 3 on page 9 of our reply

brief, I note that the plaintiff conceded in their response memo that it did not register its alleged code as a compilation, and that the compendium -- they argued that the compendium discussion of compilation was irrelevant. So I just wanted to point that out in light of what Mr. Neta just said.

Again, everything that -- the only thing that was copied was mentioned in paragraph 47 to the complaint and in Exhibit 2 to Dr. Mitchell's declaration is all CSS.

And what I think -- when Mr. Neta talks about all these comments and all these class names and the like, he's talking about what Mr. Tittel excerpted at paragraph 6 of his supplemental declaration. That's it. That's all we're talking about here.

And I do think it would advance -- for example, we have not argued that this is functional. The style sheet by itself is not functional. Mr. Neta keeps repeating that argument. We have addressed that in our reply memo.

You are free, and I do think it would advance the ball, to at least address the -- whether there's anything protectable in the style sheet.

Because if you -- I don't hear him saying that the width -- the font size and the width and the padding is protectable.

THE COURT: No. What I understand is the descriptor like .spons-link --

MR. GRANNEMAN:  Right.

THE COURT:  Those are descriptors that they came up with --

MR. NETA:  That's precisely right.

THE COURT:  Those are descriptors that they came up with that, even in the context of CSS, is protectable; you say it's not.

MR. GRANNEMAN:  I say it's not protectable.

THE COURT:  That's kind of the core of this dispute, isn't it?

MR. GRANNEMAN:  Right.

THE COURT:  At least for this requirement.

MR. NETA:  That appears to be the case, Your Honor. And I think that distinction hopefully makes sense of the rest of the compendium.  Because you can get a copyright for certain website content.  You can get a copyright in compilation, authorship, as Mr. Granneman just pointed out.  You can get a copyright in imperceptible HTML code, and you can't get a copyright in CSS, which is a method of operation.

Now, I'll note also that the copyright office says, HTML code is a markup language that merely formats the text and files on a web page.  It says that.  And it also says that HTML is copyrightable.  So that distinction has to be the one that makes sense.

THE COURT:  What does it mean, though, when it says

because procedures, processes and methods of operation are not copyrightable, the Office generally will refuse to register claims based solely on CSS?

MR. NETA:  Because I think the Office understands that a lot of CSS are just predetermined terms, one after the other, h1, h2, h3, color, width, font size, et cetera, et cetera, et cetera.

THE COURT:  Well, you said predetermined terms, h1? What do you mean by predetermined term?

MR. NETA:  It's a term that's predefined.  There's a --

THE COURT:  You mean like a default?

MR. NETA:  Not exactly a default.  It can be defined by a consortium of folks who come up with terms that are used and are commonly used --

THE COURT:  How does one determine whether it's a predefined term or a user-defined term?

MR. NETA:  The dot.  And we discussed this during the deposition with Mr. Tittel.

MR. SHELTON:  I think I can answer your question for you.  What I believe Mr. Neta is referring to is what I would call a syntactical element.  And so, for example, heading 1 or h1, that's defined in HTML standards.

So when you use h1 as -- it's been called descriptor over and over, which has been bothering me because there's no such

term in CSS; it's called a selector, as I mentioned.

So when you use the selector h1 and follow it with an opening curly brace, that indicates that that selector, that style, defined after h1, will be used anywhere the heading 1 tag is used in HTML.

THE COURT:  Right.

MR. SHELTON:  So if you then defined a class that would be, you know, .inset, like I used, that that's indicating that you're defining where you want that style to be applied, not by virtue of its HTML tag type but solely where that arbitrary class name is found within the HTML.

THE COURT:  But the HTML tag, don't you apply that tag when you design -- don't you have to designate where each one is in h2, or is that automatically --

MR. SHELTON:  You do.  So if you're using h2, you're indicating to the browser that you want to use the heading 2, the default style, if you will.  And if you don't indicate in your CSS or your excess cell that you want to use something other than what the browser has by default, then the browser understands what h2 as an HTML tag means, and it will make it a little smaller than h1, larger than h3, it will be black font, and it will be basically in Times New Roman --

THE COURT:  So it's -- I don't know if you want to call it default -- there's an automatic kind of style associated with each one?

**MR. SHELTON:**  That's right.

**MR. NETA:**  That's correct.

**MR. SHELTON:**  And that's how HTML started.  For eight years, there was no CSS.  And so all of the presentation of the content information was included in the HTML tag.  What CSS did was divorce the presentation information, such as color, font, weight, et cetera, away from content so that it would make the HTML cleaner.

**MR. NETA:**  But h1, h2, h3, whether or not you want to call it default -- maybe it's easier for us to do that -- if it wasn't defined within CSS, the system would figure out exactly --

**THE COURT:**  You mean the display, it already knows how it's going to be displayed?

**MR. NETA:**  Right.  But .inset, if it wasn't defined, would be nothing, it would be just junk.  It would be language in the code that has no impact.

And so I submit that the distinction has to be these predetermined terms versus these user-defined terms, which are creative, nonfunctional in and of themselves, totally arbitrary, they can be organized and displayed wherever you want within the code base.

**THE COURT:**  Okay.  Thank you for that clarification.

**MR. SHELTON:**  Yes, Your Honor.

**THE COURT:**  Well, that tees up a key question.

I think I'm inclined -- I'm not sure exactly what the context is, but I think it's something we ought to address one way or the other.  Certainly part of the scope of this case, at least we've now zeroed in on exactly where the dispute is, I'll say that the compendium leaves a little bit of uncertainty because it does say solely on CSS, and yet it makes a reference to methods of formatting, et cetera, et cetera.

But there is this inherent tension because that's sort of what HTML does too.  I mean, it does dictate a certain visible result, which itself is not copyrightable, but the underlying code to get there, at least some aspect of it, is copyrightable.  It's presumptively copyrightable if it has a sufficient amount of creativity.

**MR. NETA:**  That's right, Your Honor.  And I don't know if this addresses the fundamental question of deference, the degree of deference you want to extend to the compendium.

**THE COURT:**  Well, that's why I asked from the outset, that nobody has contested the compendium itself in terms of it being something not worthy of deference, something out of whack with the Copyright Act.  Everybody seems to accept that it's a reasonable interpretation.  Now the question is interpreting the interpretation.

**MR. NETA:**  Precisely.

**THE COURT:**  All right.  Well, I will take it under submission.  I know there's a claim about preemption and the

whole question about additional element and all of that, but I think this threshold question is such a fundamental question that that's what I need to -- I've got the briefing on the other stuff, so we don't need to spend a whole lot of time on that.

So I'm going to take this under submission and try to make heads or tails out of the compendium and what I've learned today.  Thank you for the -- it's been enlightening, and I appreciate the tutorial.

Let me just briefly go over the case management aspects. I was -- I'm always interested in alternative dispute resolution and what the parties' amenability is.  You've indicated that private mediation may be useful here, but I couldn't tell what it is that needs to be done in order to get to private mediation, what work needs to be done.

Do you have to do some additional discovery at this point? I assume you want a ruling from me, or maybe not.

**MR. GRANNEMAN:**  Your Honor, I would like a ruling from you.  I am not optimistic that there's really a basis to settle this and that mediation -- further mediation would be productive.  I'm not.

I would like to get some idea of how the Court is leaning on this issue of copyrightable and how that works.

**MR. NETA:**  Your Honor, I'm always amenable to mediation.  I'm certain my client is, as well.  But I think it

might be difficult to do that without this issue being resolved, respectfully.

**THE COURT:**  So if I resolve this issue one way or the other, is it your view there still would need to be some additional work before you approach mediation?

**MR. GRANNEMAN:**  My answer would be it would depend upon what you say.

**MR. NETA:**  Isn't that always the answer?

**MR. GRANNEMAN:**  I'm not -- I'm not sure there would be a need for additional discovery at that point.  But it will depend on what is said.

**THE COURT:**  How much discovery -- if we're talking about trial, and let's see -- I know it depends on what I say, but if I issue a ruling within a reasonable amount of time here, you had suggested a trial date of February of next year, which I may be able to do --

**MR. NETA:**  2017?

**THE COURT:**  2017.

**MR. NETA:**  We've taken some expert testimony.  I think -- at least from discovery, I imagine if we got substantive answers at some point to all of it -- I mean, we might not necessarily need to wait until February of 2017 if it suits Your Honor.

**MR. GRANNEMAN:**  Your Honor, we -- as you may recall from the distant past in our earlier case management

conferences, I was originally an advocate for settlement because, as you will recall, the gross revenue that my client obtained from use of this web page ranges -- we haven't done the fine math.  It ranges between 8,000 and $28,000.  That's gross revenue, not profit.

And I was interested in just getting to a settlement conference before we spent a lot of money.  Now we've spent a lot of money.  We have responded to written discovery, you've seen reference to the quantity of that and the like of what went on.  We have not done our own discovery.  We certainly will want to depose his client.  We will want to find out who actually wrote this code and depose that person because we haven't dug into whether this was all original work that wasn't copied from someplace else.

We just didn't do it because we were trying to get it resolved before we spent a lot of money.  I still don't want to spend a lot more money if we can get it resolved.

But I think the only thing -- again, we think what is even arguably copyrightable is very small, and we don't think that's copyrightable.  So I would at least like to have some read on how the Court sees this.  Because I think that will inform how we approach settlement and whether we think it's worthwhile.

**THE COURT:**  Let me ask along the lines of -- I don't want to get into settlement discussions, but you may -- what is the theory of damages here?

**MR. NETA:**  It's not statutory; it's actual damages, profits.

**THE COURT:**  It's lost profits as opposed to gained profits?

**MR. NETA:**  Yeah.

**THE COURT:**  And does this all stem from the Microsoft competition?

**MR. NETA:**  No.  It's our understanding that the code was used with respect to a number of customers.  I think it was less than 30.  But we haven't taken a lot of discovery on that issue and the scope of that.

**THE COURT:**  Let me ask this overarching question: If the look and feel and the way the website appears is not copyrightable, how difficult is it to reverse engineer and write code to get the result?

**MR. NETA:**  That's a good question, Your Honor.  I would like to depose their engineers on that question.

**MR. GRANNEMAN:**  A couple hours.

**THE COURT:**  This is not a patent where it's extremely complicated, et cetera, et cetera.  This is code. The question that arises in my mind is how much damage can there really be if the thing which you claim in your complaint pre-compendium, which is -- a lot of it is out the window now, because you claim look and feel -- there's all this language in your complaint that's now pretty irrelevant.  And so whatever

it is -- if I rule in your favor on this issue, you know, the question arises sort of so what.

If it could be reverse engineered in a matter of days, even weeks, maybe it made a difference in this rush to make the presentation to Microsoft or whatever, but to say this went on for periods and periods and periods and scores of -- are you saying lots of other people didn't copy, they were able to get this same look and feel?

**MR. NETA:**  Are you speaking to the state law claims to some extent, Your Honor?

**THE COURT:**  I'm talking about the copyright claim. What's the damages here?

**MR. NETA:**  I don't know that.  I don't know the answer to that question, Your Honor.

**THE COURT:**  Well, I'm asking sort of rhetorically in that, why can't this case be successfully mediated unless there's something going on here, a back story that I don't know about, and I don't necessarily need to know about it.

But it seems to me that, knowing that the compendium says what it says at this point, if we accept that as the rule, and even if you prevail that it's copyrightable, et cetera, using arbitrary user-selected names, but what is being copyrighted -- the copyrighted protection -- and what is being infringed and any sort of work around effects causation, damages, et cetera, et cetera, if you know what I mean.

I mean, if this were a complicated source code in a computer situation, whether it be almost impossible to come up with absent some infringement or patent, that you really did save years in coming up with this new device, whatever it is -- from what I've seen, it seems like you can take any web page, and it's not that complicated if you know the stuff, to come up with, you know, without copying, the exact terms using your own defined-user terms or whatever and come up with the same look and feel.

**MR. NETA:**  It draws the question why they didn't just do that and why others didn't.

**THE COURT:**  I'm not saying that there's not maybe a violation.  I'm just saying, at the end of the day -- maybe they did it because there was a rush to get it before Microsoft.

I'm just saying if the Microsoft contract was one discrete thing, and you're also suing on a bunch of other things -- I'm just not sure that we keep going.  Because the next stage is going to be summary judgment motions.  There's going to be another round of expert stuff.  Who knows if there's going to be Daubert challenges and everything else.

I mean, we can end up spending a whole lot of money on this, and in my mind, towards what he said, given what we now know under the compendium is a very limited right.  It may be the right exists here, and it may be that it was infringed, but

are they limited --

MR. NETA:  As I said, Your Honor, I'll repeat it. I'm amenable to mediation.  I believe my client is, as well. It sounds as if Mr. Granneman is not.  That is not to -- it's not to be pejorative at all.  If he doesn't want to mediate, that's his choice.

But I will tell you that I think the question is, to some extent, premature.  Because while we did get a spreadsheet indicating sort of generically who their customers -- that they obtained this revenue from these customers, I don't think I've ever -- my career hasn't been as long as some, but I don't think I've ever in my career settled a copyright infringement case without some formal records about revenue and profits and customers, et cetera.  I've just never done that.

MR. GRANNEMAN:  We gave them the information under oath.  There are no records.  This exists in an electronic database.  You have to run queries against the database to get the revenue information and the usage information out.  We have generated all that and given it to them.

THE COURT:  Is there some information that needs to be given still that's not been produced?

MR. GRANNEMAN:  No.

MR. NETA:  It appeared to be a spreadsheet that was created by Mr. Granneman's office.  Just last month, I settled a copyright infringement case in Washington.  And in advance of

that, the plaintiff wouldn't even go to mediation unless I produced exhaustive records on financials. They wouldn't even go to mediation. I'm willing to go, but I think more than that single spreadsheet is important.

THE COURT: Well, I'm wondering if I ought to refer this to a magistrate judge with the power to -- you know, if there's a discovery dispute or a dispute with regard to what documentation is needed in order to meaningfully mediate this thing, a magistrate judge could handle that as well as the mediation or the settlement conference.

If that's one of the problems, we should be able to get around that.

MR. NETA: I think so, Your Honor. I know you've had conversations with Judge Corley on this subject just some time ago before we filed a response, and we were completely rebuffed, and it was based on the fact that this motion had a limited set of issues at stake and didn't draw upon all this discovery, but we've been completely rebuffed with our discovery requests.

MR. GRANNEMAN: I might say deservedly so, Your Honor.

THE COURT: Judge Beeler -- it was a settlement?

MR. GRANNEMAN: Settlement judge, yes.

MR. NETA: Yeah. And then we had a discovery hearing before Judge Corley.

THE COURT: So you have been to Judge Beeler?

MR. NETA: That's correct.

MR. GRANNEMAN: She did the settlement conference.

THE COURT: When was that?

MR. GRANNEMAN: Back in May, I think.

MR. NETA: That sounds about right.

THE COURT: Is there any motion now pending before Judge Corley with respect to --

MR. NETA: There is not, Your Honor.

MR. GRANNEMAN: We still have a long-pending joint letter that was submitted to Your Honor a long time ago. I forget even when, June or July maybe.

MR. NETA: I think what ended up happening is that got referred to Judge Corley, and she resolved it against us.

MR. GRANNEMAN: We'll, there've been two joint letters.

MR. NETA: Was not one expanded on the other one?

MR. GRANNEMAN: No. There was an original joint letter where I had asked -- and as I've repeated in the case management statement -- to get referred to a magistrate so we can do -- to deal with these discovery issues and the scope of discovery and protective order as to the significant portion of what they've been asking for. It's obviously very overbroad in our view.

THE COURT: So that hasn't been referred? It

wasn't --

MR. GRANNEMAN:  That was not set --

THE CLERK:  We did refer the whole case to Judge Corley for discovery.

THE COURT:  Maybe it got filed here and never got --

MR. GRANNEMAN:  What ended up happening was there was kind of two pieces to this.  There was the original joint letter, and then as we went to case management conference, you set up the schedule for the summary judgment motion and motion to dismiss.  And then there was a separate joint letter that dealt with Media.net's request for additional discovery in addition to Mr. Tittel's expert deposition.

And so the question of whether they would be allowed to get additional discovery relative to the motion did go to Judge Corley, but that was not the substance of the original joint letter.  And I apologize, I just can't remember when we did it.  It was --

MR. NETA:  I could try to find it in the --

THE CLERK:  August 17 was the joint letter.

MR. NETA:  That was the second one.

THE CLERK:  Was that the second one?

MR. GRANNEMAN:  It must have been because we filed the motion July 30, I think.

Is that right?

THE CLERK:  August 17 is the one that I found.

**MR. GRANNEMAN:**  There was an earlier one.

**THE CLERK:**  There's an earlier one?

**THE COURT:**  But she resolved the earlier one or --

**MR. GRANNEMAN:**  No, she resolved the second one, which was narrower.

**THE COURT:**  So the first one is still pending?

**MR. GRANNEMAN:**  Yes.

**THE CLERK:**  May 14 from Plaintiff.

**MR. GRANNEMAN:**  That's probably right.  Mr. Neta would have filed it.

**THE CLERK:**  Do you want me to print it out?

**THE COURT:**  Yeah.  That should have been resolved.

**MR. NETA:**  Oh, I can see what may have happened, Your Honor.  Immediately after that, I filed a motion for leave.  I think Judge Beeler filed her minute entry.  We filed the CMC.  It just got lost in the shuffle.

**THE CLERK:**  I'm looking at -- Judge Beeler has an entry of May 27.  She was doing some discovery for you guys at some point?

**MR. NETA:**  She had settlement communications.

**MR. GRANNEMAN:**  She was going to try to reach some kind of settlement approach to --

**MR. NETA:**  Oh.  Yeah, she said, Court reiterated its offer of assistance with any discovery issues on a mediated model and in aid of productive settlement conversations.

THE COURT:  She was going to mediate the discovery?

MR. NETA:  She offered to.

THE COURT:  And maybe that's where it got left?

MR. NETA:  I think that might be true, Your Honor.

THE COURT:  Okay.  That never happened?

MR. GRANNEMAN:  Right.

MR. NETA:  I don't think it ever happened, Your Honor.  Because after we filed the amended complaint and after we had the CMC, Mr. Granneman stated his intention to file a summary judgment motion.  And then there was a dispute of what discovery we would need for the summary judgment motion because Your Honor said we would only be allowed to have discovery with respect to that motion.

THE COURT:  So do you both feel that the May letter issues still need to be resolved?

MR. NETA:  Yes.

MR. GRANNEMAN:  Yes.

THE COURT:  Okay.  I will look for that.

The May letter should be referred to Judge Corley, the discovery judge.

THE CLERK:  Okay.

THE COURT:  Well, maybe what I need to do is rule on this issue and refer you back to Judge Beeler unless you want to go somewhere else.

MR. GRANNEMAN:  No.  Well, I'm fine with

Judge Beeler, Your Honor.

MR. NETA:  I might be interested in considering a private mediator, but that's fine.

THE COURT:  Why don't we do this:  I'm going to, for now, set a February 6th, 2017 trial date because this case has been pending for a long time.

Meanwhile, let's schedule a follow-up CMC, let's say, in 60 days.  Hopefully, I will rule before that, and at that point we can talk about, once you get my ruling, where we go from there and see if we can expedite the process.  Because I really am concerned about this case absorbing a tremendous amount of resources on both sides when it may make more sense to try to see what can be done to resolve this.

MR. NETA:  I appreciate that, Your Honor.

THE CLERK:  The status conference will be February 18th at 10:30.

THE COURT:  All right.

THE CLERK:  Counsel, this is a four-day trial?

MR. GRANNEMAN:  I think that's what we said.  I was thinking four evidence days probably.

THE COURT:  We may need to go a day extra for jury selection, so we'll call it five court days.

MR. GRANNEMAN:  Okay.

THE COURT:  All right.

MR. NETA:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. SHELTON:  Thank you, Your Honor.

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Tuesday, December 22, 2015




_Lori Stokes_
_____

Lori Stokes, CSR No. 12732, RPR
U.S. Pro Tem Court Reporter