UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDIA.NET ADVERTISING FZ-LLC, | Case No.  14-cv-03883-EMC |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART DEFENDANT'S MOTION TO DISMISS** |
| NETSEER, INC., | |
| Defendant. | Docket No. 36 |

## I.    INTRODUCTION

Plaintiff Media.net Advertising FZ-LLC initiated this lawsuit against Defendant NetSeer, Inc.  The First Amended Complaint ("FAC") asserts two claims of copyright infringement, as well as claims of intentional interference with business contract, intentional interference with prospective business relationship, and violations of California's Unfair Competition Law ("UCL"), California Business and Professions Code section 17200 *et seq*.  Docket No. 32.

Defendant moves for summary judgment on the copyright infringement claims and to dismiss the state law claims.  Docket No. 36.  In the alternative, Defendant seeks dismissal of the copyright claims or a more definite statement.  *Id.*  Having considered the parties' briefs and oral argument, as well as the relevant legal authority, the Court hereby **DENIES** Defendant's Motion for Summary Judgment and **GRANTS IN PART** Defendant's Motion to Dismiss.

## II.    BACKGROUND

Plaintiff is a leading provider of online contextual-advertising services and offers its customers a website-based advertisement creation platform (the "Platform") which allows its users to create custom advertisements.  *Id.* ¶¶ 1, 21, 24.  Website publishers using the Platform can place

**United States District Court**
For the Northern District of California

a Media.net ad unit on their websites so that when a website visitor clicks on the ad unit, the visitor is taken to a "search-results page" which displays relevant advertisements. *Id.* ¶ 26. For example, if a website visitor clicked on a keyword relating to travel, the search results page could show advertisements promoting deals on hotel rooms. *See, e.g.,* Ex. C, FAC. Plaintiff published the original version of its search results page ("Original Media.net Results Page") on February 1, 2014. *Id.* ¶ 28. On May 28, 2014, Plaintiff published a revised search results page ("Revised Media.net Results Page"), which is derivative of the Original. *Id.* ¶¶ 33-34.

Plaintiff obtained a copyright registration for its Original Media.net Results Page with registration number TX 7-896-126 (the "'126 Registration") and for its Revised Media.net Results Page with registration number TX 7-896-131 (the "'131 Registration"). *Id.* ¶¶ 32, 37; Exs. A-B, FAC. Both registrations became effective on August 16, 2014. '126 Reg.; '131 Reg. The certificates list "Media.Net Software Services (India) Private Limited" as the author, which created "HTML Code and text," and list "Media.net Advertising FZ-LLC" as the claimant. *Id.*

Defendant is a competing contextual-advertising provider. FAC ¶¶ 38-39. Defendant also provides advertising units that its customers can place on their websites. *Id.* ¶ 39. Like Plaintiff's Platform, when a user clicks on Defendant's advertising unit, the user is directed to a search-results page that offers relevant advertisements. *Id.* ¶ 40. Plaintiff alleges Defendant directly copied Plaintiff's hypertext markup language ("HTML") code, including arbitrarily-named variables and portions of the code that have no function, and used it to create Defendant's own search results page. *Id.* ¶¶ 42-46.

Plaintiff further alleges Defendant's unauthorized use of the HTML code allowed it to gain an unfair competitive advantage. *Id.* ¶ 58. In particular, Plaintiff claims Defendant undermined Plaintiff's relationship with Microsoft by representing that Defendant's products could work just as well as Plaintiff but at a lower cost. *Id.* ¶¶ 60-61. Defendant's infringement improved its position in the contextual-advertising market and allowed it to earn revenue from customers it obtained as a result of using Plaintiff's product. *Id.* ¶ 67-69. Consequently, Plaintiff was forced to lower the rates it charged its customers, causing it to lose millions of dollars in revenue. *Id.* ¶ 65. Plaintiff's reputation as the leader in contextual-advertising services has diminished. *Id.* ¶ 71.

United States District Court
For the Northern District of California

# III.    LEGAL STANDARD

A.    Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact."  The movant bears the burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted).  A material fact is one that may affect the outcome of the case. *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine dispute as to material fact exists if there is sufficient evidence such that a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248.  This requires more than a "mere existence of a scintilla of evidence in support of the plaintiff's position[.]" *Id.* at 252.

When determining whether there is a genuine issue of material fact, "a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  Courts should also draw reasonable inferences in favor of the non-moving party. *Tolan*, 134 S. Ct. at 1868.  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049-50 (9th Cir.) *cert. denied sub nom. SQM N. Am. Corp. v. City of Pomona, Cal.*, 135 S. Ct. 870, 190 L. Ed. 2d 703 (2014) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

If the moving party has "the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  If, on the other hand, the burden of proof rests on the non-moving party, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.*  "A party opposing a properly supported motion for summary judgment may not rest upon mere

allegation or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

B.    Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the failure to state a claim upon which relief may be granted. A Rule 12(b)(6) motion tests the sufficiency of a complaint by failing to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although a complaint need not contain "detailed factual allegations," a complaint that contains merely "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Rather, "'[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

In ruling on a Rule 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Courts may dismiss a claim "only if it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim which would entitle him to relief." *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (quotation marks omitted). Courts should grant the plaintiff leave to amend "'if it appears at all possible that the plaintiff can correct the defect.'" *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc)).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

# IV.   DISCUSSION

A.   The Compendium

The United States Copyright Office is "'the governmental agency that possesses special expertise in determining the bounds of copyright protection.'"  *Garcia v. Google, Inc.*, 786 F.3d 733, 741 n.7 (9th Cir. 2015) (quoting 2 Nimmer on Copyright § 7.16[B][3][b][vi]).  In addition to administering the system of copyright registration, the Copyright Office works closely with Congress on matters relating to copyright laws.  17 U.S.C. § 701(a); 2 Nimmer on Copyright § 7.26; *see* 17 U.S.C. § 701(b)(2) ("[T]he Register of Copyrights shall . . . [a]dvise Congress on national and international issues relating to copyright, other matters arising under this title, and related matters"); *Feist Pub., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 354-55 (1991) ("When Congress decided to overhaul the copyright statute and asked the Copyright Office to study existing problems, . . . the Copyright Office promptly recommended that Congress clear up the confusion in the lower courts as to the basic standards of copyrightability." (citation omitted)); *Mills Music v. Snyder*, 469 U.S. 153, 159-61 (1985) (describing Copyright Office and Congress's general revision of copyright law in 1955); S. Rep. No. 101-268, at 6 (1990) ("Congress relies extensively on the Copyright Office to provide its technical expertise in the legislative process.").

The Copyright Office publishes an administrative manual that contains, *inter alia*, legal interpretations and guidance regarding copyright registrations.  *See* U.S. Copyright Office, Compendium of Copyright Practices (3d ed. 2014) ("Compendium (Third)").  The Compendium "provides guidance to copyright applicants, practitioners, scholars, the courts, and members of the general public regarding institutional practices and related principles of law."  *Id.* Intro. at 1.  The Copyright Office first published the Compendium in 1967 and released the second edition ("Compendium II") in 1984.  *Id.* Intro. at 4.  It revised the Compendium II first in 1988 and again in 1998.  *See* U.S. Copyright Office, Compendium of Copyright Practices (2d ed. 1984).

The Copyright Office released a draft of third edition of the Compendium on August 19, 2014.  U.S. Copyright Office, U.S. Copyright Office Announcement Regarding Release of a Draft of the Compendium of U.S. Copyright Office Practices, Third Edition (Aug. 19, 2014), http://copyright.gov/newsnet/2014/555.html.  This draft was the first major revision of the

Compendium in over twenty years, and it took the Copyright Office over two years to complete. *Id.* The Compendium remained in draft form for approximately 120 days, during which time the Copyright Office accepted feedback on the draft from the public. *Id.* The Copyright Office released the final version of the third edition on December 22, 2014, and it became effective immediately. Compendium (Third) Intro. at 1.

The Ninth Circuit has held that the Copyright Office's decisions and opinions are not entitled to the level of deference afforded under *Chevron U.S.A. Incorporated v. Natural Resources Defense Council, Incorporated*, 467 U.S. 837 (1984).[1] *Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 755 F.3d 1038, 1041 (9th Cir. 2014), *as amended* July 9, 2014, *cert. denied*, 135 S. Ct. 758 (2014) ("Because *Chevron* deference does not apply to internal agency manuals or opinion letters, we defer to the Copyright Office's views expressed in such materials "only to the extent that those interpretations have the 'power to persuade.'""). Instead, the Ninth Circuit has long held that the Copyright Office's interpretations of copyright law are entitled to the lower level of deference applicable under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *See United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) ("[A]gencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered."). Under *Skidmore*, the degree to which a court defers to an agency's opinion or interpretation "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140; *see Christensen v. Harris*

---

[1] *Chevron* deference is appropriate "[w]hen Congress has explicitly left a gap for an agency to fill, [and] there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation[.]" *Mead Corp.*, 533 U.S. at 227 (quotations and citation omitted). Under those circumstances, "any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *Id.* An agency's interpretation of a statute "certainly may influence courts facing questions the agencies have already answered." *Id.* Courts may defer to an agency's interpretation in the absence of "express [congressional] delegation of specific interpretative authority" where the agency's authority and other circumstances otherwise make it apparent "that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which 'Congress did not actually have an intent' as to a particular result." *Id.* at 229 (quoting *Chevron*, 467 U.S. at 845).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

*Cnty.*, 529 U.S. 576, 587 (2000) (holding agency manuals are entitled to *Skidmore* deference, "but only to the extent that those interpretations have the power to persuade.").  *See also Inhale, Inc.*, 755 F.3d at 1041 ("When interpreting the Copyright Act, we defer to the Copyright Office's interpretations in the appropriate circumstances" but "only to the extent that those interpretations have the power to persuade" (internal quotations omitted)); *Batjac Prods. Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223, 1231 (9th Cir. 1998) (concluding interpretation set forth in Compendium II was "reasonable and consistent" and thus "entitled to deference."); *Marascalco v. Fantasy, Inc.*, 953 F.2d 469, 473 (9th Cir. 1991) ("We agree with the D.C. Circuit that the Register has the authority to interpret the copyright laws and that its interpretations are entitled to judicial deference if reasonable." (citing *Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*, 836 F.2d 599, 607-10 (D.C. Cir. 1988)).  In doing so, the Ninth Circuit notes "[t]he Copyright Office's well-reasoned position reflects a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Garcia v. Google, Inc.*, 786 F.3d 733, 741-42 (9th Cir. 2015) (quotation marks omitted).[2]

---

[2] The Ninth Circuit's position is consistent with its sister courts.  Other Courts of Appeal also defer to the Copyright Office's interpretations and practices, and while the degree of deference varies somewhat between the circuits, none have applied *Chevron* deference.  The Second, Sixth, and Eleventh, and District of Columbia Circuits, like the Ninth, afford the Copyright Office's interpretations *Skidmore* deference.  *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 129 (2d Cir. 2008) ("We assume, as the parties do, that the Copyright Office's pronouncement deserves only *Skidmore* deference, deference based on its 'power to persuade.'"); *Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 479-81 (6th Cir. 2015) (collecting cases and holding that Copyright Office's determination that work is protectable is entitled to *Skidmore* deference); *Olem Shoe Corp. v. Wash. Shoe Corp.*, 591 F. App'x 873, 882 (11th Cir. 2015) (giving *Skidmore* deference to Compendium's interpretation "as the copyright law is 'highly detailed' and it is apparent that the Copyright Office 'can bring the benefit of specialized experience to bear on the subtle questions in this case.'" (quoting *Mead Corp.*, 533 U.S. at 235)); *Cablevision Sys.*, 836 F.2d at 610 (D.C. Cir. 1988) (Copyright Office's "interpretations are therefore due the same deference given those of any other agency.").  The Third Circuit has also deferred to the Copyright Office but did so without stating to what degree.  *See Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 286 n.5 (3d Cir. 2004) (en banc) (noting "the practice of the Copyright Office reflects a body of experience and informed judgment to which courts and litigants may properly resort for guidance" but declining to "decide what degree of deference is warranted under the circumstances" (quotation omitted)).  *Cf. De Sylva v. Ballentine*, 351 U.S. 570, 577-78 (1956), (while the Court "would ordinarily give weight to the interpretation of an ambiguous statute by the agency charged with its administration, . . . [it thought] the Copyright Office's explanation of its practice deprives the practice of any force as an interpretation of the statute, and [it] therefore d[id] not rely on it in th[at] instance.") (citation omitted).

**United States District Court**
For the Northern District of California

Accordingly, the Court affords the Compendium *Skidmore* deference and adopts the Copyright Office's interpretations of copyright law where it finds them reasonable and persuasive. Here, neither party disputes the interpretations at issue contained in the most recent Compendium and the Court finds those interpretations reasonable.

B.      Copyright Infringement Claims

      1.      Motion for Summary Judgment

In order to prevail on its copyright infringement claims, Plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'n*, 499 U.S. at 361.  Defendant's Motion is based on the first element; Defendant seeks summary judgment on the basis that Plaintiff's copyright registrations do not contain copyrightable material.[3]  Mot. at 3-7.  In part, Defendant argues it is entitled to summary judgment because the look and feel of Plaintiff's webpages is not entitled to copyright protection. Mot. at 13-17.

Plaintiff's FAC alleges Defendant infringed the look and feel of Plaintiff's webpages, as well as other elements of those pages.  *See* FAC ¶ 2 ("Net[S]eer . . . misappropriated Media.net's copyrighted search-results pages' code, design, and look and feel in creating its own results pages."); *id.* ¶ 57 ("Net[S]eer stole the look and feel of Media.net's advertisement creatives and search-results pages. . . ."); *id.* ¶ 98 ("Defendants intentionally induced a disruption of the business relationship . . . by stealing the Media.net Results Pages' source code, design, and look and feel . . . .").  Plaintiff now acknowledges that the look and feel of its search results page is not subject to copyright protection.  Opp'n at 9 ("Media.net did not seek a copyright in the content

_____

[3] In an infringement action, the Court must address the threshold question of the ownership of a valid copyright. *Topolos v. Caldewey*, 698 F.2d 991, 994 (9th Cir. 1983) (holding "district court erred in concluding it lacked jurisdiction over . . . actions for infringement because it was first required to resolve a threshold question of copyright ownership which in turn called for interpretation of a contract."); *Jonathan Browning, Inc. v. Venetian Casino Resort LLC*, 2009 WL 1764652, at *1 (N.D. Cal. June 18, 2009) ("Determinations of copyrightability are indeed questions of law reserved for the judge, not the jury."); 2 Nimmer on Copyright § 12.10[B] ("[C]ertain . . . matters are reserved to the judge.  Included are determinations of copyrightability in all instances.").  Defendant does not contest ownership for purposes of this Motion, but it reserves the right to so challenge if the Court denies the motion.  *See* Mot. at 4 n.4; pg. 17 of this Order.

United States District Court

For the Northern District of California

that one perceives on [its search results] pages.  As a result, Plaintiff's copyrights do not grant it the exclusive right to the layout, format, or look and feel of its search results pages. [ ] Anyone – including NetSeer – is free to make pages that look like Media.net's."); *id.* at 13 ("The Media.net Registrations only claim protection in HTML code and accompanying text – they do not claim copyright protection in the resulting webpage.  NetSeer's arguments about website look and feel are irrelevant.").  Plaintiff's current position reflects the views of the Copyright Office:  the Compendium makes it clear that a website's look and feel is not copyrightable subject matter. Compendium (Third) § 1007 ("Examples of uncopyrightable material include . . . [t]he layout, format, or 'look and feel' of a website."); *id.* § 1007.4 ("The copyright law does not protect the overall look and feel of a website.").

Instead, Plaintiff has now clarified that its copyright claim is based on its hypertext markup language ("HTML") code that underlies its websites, contending that the HTML's code, not the look and feel of the website itself, is copyrightable subject matter.

### a.   Presumption of Validity

The Copyright Act, 17 U.S.C. §§ 100-810, protects "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a).  The Copyright Act charges the Register of Copyrights to determine if a submission "constitutes copyrightable subject matter and [to ensure] that the other legal and formal requirements of this title have been met."  *Id.* at § 410(a).  This process is more than a "mere clerical function of recording application.  Instead, the Register makes a judgment after examining an application."  *Alaska Stock, LLC v. Houghton Mifflin Harcourt Pub. Co.*, 747 F.3d 673, 683 (9th Cir. 2014).  If the Register determines a submission is copyrightable and the other requirements are fulfilled, "the Register shall register the claim and issue to the applicant a certificate of registration under the seal of the Copyright Office."  17 U.S.C. § 410(a).  If, however, a submission "does not constitute copyrightable subject matter or . . . the claim is invalid for any other reason, the Register shall refuse registration and shall notify the applicant in writing of the reasons for such refusal."  *Id.* § 410(b).

United States District Court
For the Northern District of California

"A copyright registration is 'prima facie evidence of the validity of the copyright and the facts stated in the certificate'" and creates a rebuttable presumption of validity. *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011) (quoting 17 U.S.C. § 410(c)). The party disputing validity "must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement." *Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140, 1144 (9th Cir. 2003) (quotation omitted). If that party successfully rebuts the presumption, the burden shifts back to the plaintiff to demonstrate a valid copyright. *See Entm't Research Grp. v. Genesis Creative Grp.*, 122 F.3d 1211, 1218 (9th Cir. 1997) (finding, where defendant "had rebutted the statutory presumption, . . . the district court properly shifted the burden of proving validity—the threshold issue for copyright infringement lawsuits—back to [the plaintiff].").

The FAC alleges Plaintiff holds copyright registrations for the Original and Revised Media.net Results Pages, and the two registration certificates are attached as exhibits. FAC ¶¶ 31-37; *see* '126 Reg.; '136 Reg. These certificates create a presumption that Plaintiff's '126 and '131 copyright registrations are valid. Compendium II, which was first published in 1984 and was effective at the time Plaintiff submitted its copyright applications, is silent as to the question of the copyrightability of HTML code. Nevertheless, the Copyright Office had likely contemplated the issue when it evaluated Plaintiff's applications and decided to issue the registrations. The Court notes that the Copyright Office spent two and a half years revising the Compendium and released the final version on December 22, 2014, approximately four months after Plaintiff's '126 and '131 copyright registrations became effective. *See* Compendium (Third) Acknowledgments, Intro. In addition, on August 19, 2014, the Copyright Office released a public draft of the Compendium, a mere three days after Plaintiff's copyright registrations went into effect. Given the Copyright Office's decision to issue Plaintiff copyright registrations and also the proximity between the Compendium's release and Plaintiff's registrations, Plaintiff's copyright registrations are clearly entitled to a presumption of validity. It is fair to infer that the Copyright Office's decision to issue to registrations were consistent with its views expressed in Compendium (Third) issued shortly thereafter.

United States District Court
For the Northern District of California

b.      Copyrightable Subject Matter

Defendant argues Plaintiff's copyright registrations are invalid because they do not contain copyrightable subject matter.  Specifically, Defendant asserts Plaintiff's HTML code consists solely of uncopyrightable Cascading Style Sheets ("CSS"), which renders Plaintiff's copyright registrations invalid.  Mot. at 3-4, 15-17.  Defendant presents as support the Declaration of Edward R. Tittel, a business and computing technology author and consultant.  Tittel Decl. ¶ 2, Ex. 2, Mot.  Having examined the HTML code at issue, Mr. Tittel opines that "[t]he accused markup occurs in the context of [a] pair of . . . HTML[] documents."  *Id.* ¶ 7.  However, "that accused markup consists almost entirely of Cascading Style Sheet markup, enclosed between a pair of HTML elements that denote an embedded style sheet within an HTML document[.]"  *Id.*

In response, Plaintiff argues its copyright registrations are valid because its HTML code is a "literary work" under section 102(a) of the Copyright Act.  Opp'n at 11; *see* 17 U.S.C. § 102(a)(1) ("Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . .  Works of authorship include . . . literary works[.]").  Plaintiff offers the declaration of Dr. John C. Mitchell, [4] a professor of computer science at Stanford University, who examined Plaintiff's HTML code.  Mitchell Decl., Docket No. 53.  Dr. Mitchell opines that the code "contain a substantial amount of expressive conduct."  *Id.* ¶ 41.  In particular, he points to names of class styles in CSS; a programmer can name a class style however he so desires.  *Id.* ¶ 43.  Plaintiff essentially argues that this infuses the HTML code with creativity sufficient to establish copyrightability.

2.      HTML & CSS

HTML "is the standard markup language used in the design of websites" and "establishes the format and layout of text and graphics when a user views a website by instructing the user's

---

[4] Defendant objects to Dr. Mitchell's testimony and alleges Dr. Mitchell examined materials not made available to Defendant.  Docket No. 57.  In his Declaration, Dr. Mitchell refers to "deposit materials."  *Id.* at 1.  Defendant contends it requested the deposit materials and that counsel for Plaintiff assured Defendant those materials had been produced.  *Id.*  However, because Dr. Mitchel does not refer to Exhibits C or D, Defendant argues it cannot be certain what Dr. Mitchell reviewed.  *Id.*  At the December 7 hearing, Plaintiff's counsel represented that it is simply a matter of terminology – the deposit materials are in fact Exhibits C and D, which were available to Defendant.  There is no evidence to the contrary.  Defendant's objection is overruled.

browser to present material in a specified manner." Compendium (Third) § 1002.4. HTML is contained between the start tag <html> and closing tag </html>. At the hearing, Barry Shelton[5] explained that HTML originally had two functions: (1) to present content and (2) to include information about how to present that content, such as font, size, color, and margins. In 1996, however, web developers began using CSS to separate a webpage's content from its presentation. CSS thus controls the content of a webpage – that is, the look and feel to the user – without containing content. CSS are "a method of presenting structured documents [] used to format and layout the organization and a uniform presentation of webpages in a written markup language, such as HTML." Compendium (Third) § 1002.5. CSS begin with the opening tag <style> or <style type="text/css"> and end with the tag </style>. Tittel Decl. ¶ 7.

Mr. Shelton pointed out that the at-issue CSS are not part of HTML. Although CSS is often used with HTML, CSS have their own specifications. CSS control how styles are inherited; in other words, they create rules that specify how a style will cascade or flow through other elements of the webpage.

A style is demarcated with opening and closing braces ("{" and "}"). Styles begin with a selector, which indicates which elements of HTML are automatically assigned a particular style. A style may, for instance, define the color (which can be expressed using hexadecimal notation[6] or by simply writing the color name), the font family (size, weight, etc.), text alignment, and background color.

A "class" is a style that starts with a period – for example, ".demo". The user defines the name that follows the period (in the foregoing example, "demo"). This name is arbitrary, but Mr. Shelton explained that the name is generally functional or scripted so that the user later knows to what the class refers. For instance, Mr. Shelton presented as an example the class ".inset". Although he chose "inset" as the class name because it suggests a particular function/location, Mr.

_____

[5] Mr. Shelton is an electrical engineer who has been coding in CSS and HTML since the mid-1990s. He presented a demonstration on the process of creating a webpage pursuant to this Court's December 2, 2015 Order in Preparation of Summary Judgment Hearing (Docket No. 63).

[6] A hexadecimal notation formats a red, green, and blue ("RGB") color value. It is written as three double-digit numbers and begins with a "#" sign.

United States District Court
For the Northern District of California

1   Shelton showed that he could have chosen any name – such as "xyz" – without impacting the style

2   assigned to that class.  Nevertheless, Mr. Shelton explained that the name is generally functional

3   or scripted so that the user later knows to what the class refers.

4        There are different ways to build CSS into HTML.  Both Dr. Mitchell and Mr. Shelton

5   explain that CSS are not typically contained in the same document as the HTML code but instead

6   may be stored in a different file.  Mitchell Decl. ¶ 50.  In this case, the CSS is an external file

7   which is imported into the HTML file.  *See id.* ¶ 50 (CSS can be connected to an HTML page

8   using an external style sheet that is imported into the webpage).  Consequently, there is only

9   HTML and content within the webpages; the presentation of the content is contained elsewhere.  If

10  there is no style defined (pursuant to the CSS or in the HTML code itself), the web browser uses

11  its default style settings.

12       Developers may also insert "comments" in both HTML and CSS for other developers to

13  see.  Comments are not visible on the webpage itself; a person must examine the HTML code in

14  order to read a comment.  Comments within CSS begin with "/*" and end with "*/".  Comments

15  within HTML are found between the tags <!--> and <-->.

16       3.    Copyrightability

17       "The *sine qua non* of copyright is originality."  *Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*,

18  499 U.S. 340, 345 (1991).  Originality means that (1) the author independently created the work,

19  and (2) the work "possesses at least some minimal degree of creativity."  *Id.* at 345.  The required

20  amount of creativity is "extremely low; even a slight amount will suffice."  *Id.*  Because of this

21  low standard, "[t]he vast majority of works make the grade quite easily, as they possess some

22  creative spark, 'no matter how crude, humble or obvious' it might be."  *Ets-Hokin v. Skyy Spirits,*

23  *Inc.*, 225 F.3d 1068, 1076 (9th Cir. 2000) (quoting *Feist Publ'n*, 499 U.S. at 345).  Nevertheless,

24  the degree of creativity "is not negligible."  *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003).

25  "There must be something more than a 'merely trivial' variation, something recognizably the

26  artist's own."  *Id.* (quoting *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 489 (9th Cir. 2000)).

27       "The Copyright Office continually engages in the drawing of lines between that which may

28  be and that which may not be copyrighted."  *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632

United States District Court
For the Northern District of California

1   F.2d 989, 994 (2d Cir. 1980).  The Copyright Office has drawn such a line here.  The Office will

2   register HTML code as a literary work if it was created by a human being and if it "contain[s] a

3   sufficient amount of creative expression."  Compendium (Third) § 1006.1(A).  Evidently, the fact

4   that an HTML code produces a webpage, the look and feel of which is not subject to copyright

5   protection, does not preclude its registration.  Presumably, this is because there are multiple ways

6   of writing the HTML code to produce the same ultimate appearance of the webpage.  That

7   presumably is why the Copyright Office requires the HTML code have a "sufficient amount of

8   creative expression" to be registrable.  In contrast, "[b]ecause procedures, processes, and methods

9   of operation are not copyrightable, the Office generally will refuse to register claims based solely

10  on CSS."  Compendium (Third) § 1007.4.

11          The Court finds that portions of Plaintiff's HTML code meet the requisite level of

12  creativity to be copyrightable.  Specifically, Plaintiff's HTML code employs classes, which

13  provides the opportunity for a developer to express creativity.  At the hearing, Mr. Shelton

14  presented ".inset" as an example of a class name.  As noted above, Mr. Shelton demonstrated that

15  he could have chosen any name for the class – such as "xyz" – without impacting the style itself.

16  Plaintiff has similarly elected to use certain class names, such as "spons-link" and "results li".  Ex.

17  C at 2-3; Ex. D at 2-3; Mitchell Decl. ¶¶ 54, 56-57.   Choosing these names requires a certain

18  amount of creativity.  Moreover, Defendants produce no facts suggesting there is a convention or

19  tradition to naming classes that renders the process of choosing a class name "so mechanical or

20  routine as to require no creativity whatsoever."  *Feist Publ'n*, 449 U.S. at 362.

21          Plaintiff's HTML code also contains comments.  Opp'n at 6; App'x D, Tittel Decl.

22  (explaining parts of HTML code and identifying comments); *see* Exs. C, D.  The Original Search-

23  Results Page, for instance, has the comments "/*spons-link css*/" and "/*footer css*/".  Ex. C at 2,

24  4.  Like class names, a developer can write anything in a comment.  This again requires some

25  creative thinking on the part of the developer, as a comment may contain notations or thoughts for

26  others to use.  Defendants have presented no facts showing the comments here contain information

27  that is so standard or formulaic as to require no creativity whatsoever.

28          The creativity employed in formulating the HTML code and comments here, though

**United States District Court**
For the Northern District of California

1   arguably minimal, stands in contrast to, *e.g.*, the alphabetical listing of basic information in a

2   telephone directory which is formulaic. *Feist Publ'n*, 499 U.S. at 361-64.  In *Feist Publications*, a

3   public utility and publisher of a telephone directory sued the defendant for copyright infringement

4   after the defendant used and published the plaintiff's telephone listings. *Id.* at 342.  The Court

5   noted that "[t]he end product [of the plaintiff's work was] a garden-variety white pages directory,

6   devoid of even the slightest trace of creativity." *Id.* at 362.  The plaintiff's selection of data lacked

7   creativity: publishing a person's name, town, and phone number was "basic information" that

8   "lack[ed] the modicum of creativity necessary to transform mere selection into copyrightable

9   expression." *Id.*  Nor was the plaintiff's decision to alphabetize the names a sign of creativity.

10  Rather, the Court stated that alphabetization "[was] an age-old practice, firmly rooted in tradition

11  and so commonplace that it has come to be expected as a matter of course." *Id.* at 363.  As such,

12  the Court found the copied information lacked originality and therefore not protected by copyright.

13  *Id.*  Here, as noted, at least some degree of creativity was involved in formulating the HTML code.

14        It should be noted that the choice of class name has a consequence for both the HTML

15  code and the CSS.  When the developer seeks to refer to a class in the HTML document, the

16  names must match:  In other words, when the developer incorporates the class into the HTML, the

17  developer must use the name that he gave the class in the CSS in the HTML.  The developer

18  cannot build a style into its HTML code without referencing the class name that was established in

19  the CSS.  In this way, CSS and the HTML are so inextricably linked that it is impossible to

20  evaluate one without the other.  For instance, the Original Media.net Results Page uses ".spons-

21  link" as a class name.  Ex. C at 1, FAC.  In order to incorporate the style created in the ".spons-

22  link" class into the HTML, Plaintiff had to cross-reference "spons-link" in the HTML.  *Id.* at 6.

23  Notably, Plaintiff's copyright registrations contain both HTML and CSS, with the HTML

24  referring to the class names in the CSS.  Because class names, a form of creative expression, are

25  found both in HTML as well as in the CSS, copyright protection obtains in the entirety of the

26  HTML code, even though it incorporates CSS.

27        This result is not inconsistent with the Copyright Office's view that generally, CSS alone is

28  not copyrightable.  A CSS that simply defines the layout of text is not entitled to copyright

protection, as this would constitute a "method of formatting" or "method of operation." *See* Compendium (Third) § 1007.4. That is not the case here: the HTML and the CSS are closely related and together are infused with creativity.

Accordingly, the Court finds Plaintiff's copyright registrations contain copyrightable subject matter and are valid.

### 4. Motion to Dismiss

Defendant alternatively seeks dismissal of the copyright claims pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing Plaintiff's FAC fails to identify which portions of the HTML code Defendant allegedly copied. Mot. at 17. As noted earlier, a prima facie case of copyright infringement requires the plaintiff to show (1) "ownership of the allegedly infringed material" and (2) a violation of "at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

### a. Ownership

Plaintiff must first show that it owns a valid copyright. *See OpenMind Solutions, Inc. v. Does 1-39*, 2011 WL 3740714, at *3 (N.D. Cal. Aug. 23, 2011) (finding plaintiff satisfied first element of copyright infringement where complaint alleged plaintiff's work was subject to copyright registration application and plaintiff was exclusive rightsholder of distribution and reproduction rights); *DC Comics v. Towle*, 2012 WL 630206, at *1 (C.D. Cal. Jan. 26, 2012) (finding plaintiff satisfied first element where plaintiff specifically pled it owned the disputed "copyright design"). As discussed above, Plaintiff's HTML code is copyrightable subject matter. Plaintiff's FAC alleges as much, stating that "[t]he Original Media.net Results Page contains copyrightable subject matter under 17 U.S.C. § 102(a)." FAC ¶ 74. Plaintiff makes the same allegation about the Revised Media.net Results Page. *Id.* ¶ 85.

Plaintiff further alleges that "Media.net is the owner of all exclusive and substantial rights and privileges in the Original Media.net Results Page" and in the Revised Media.net Results Page. *Id.* ¶¶ 73, 84. Additionally, the FAC asserts Plaintiff "is the exclusive assignee of the entire copyright interest in the Original Media.net Results Page" as well as "the exclusive assignee of the entire copyright interest in the Revised Media.net Results Page." *Id.* ¶¶ 31, 36. Plaintiff also

**United States District Court**
For the Northern District of California

1   offers its '126 and '131 Registrations, both of which list Plaintiff as the claimant.  '126 Reg.; '131

2   Reg.  As such, Plaintiff has likely adequately pled the first element for both of its copyright

3   infringement claims.

4                        b.      Copying of Original Constituent Elements

5          Plaintiff alleges Defendant's Results Page "was directly copied" and "is substantially

6   similar to the copyrighted Media.net Results pages."  FAC ¶¶ 42-43.  Specifically, Plaintiff alleges

7   Defendant "directly copied a substantial portion of the underlying HTML source code" and

8   "copied original elements" from both the Original and Revised Media.net Results Pages.  *Id.* ¶¶

9   44, 77, 88.  As a result, Plaintiff contends Defendant "violated Media.net's exclusive rights in the

10  Original Media.net Results Page[,]" as well as the Revised Media.net Results Page by using

11  copying Plaintiff's HTML code and using it to create its own results page.  *Id.* ¶¶ 40, 44, 78, 89.

12         A plaintiff establishes infringement by showing the defendant copied the work.  *Kamar*

13  *Int'l, Inc. v. Russ Berrie & Co.*, 657 F.2d 1059, 1062 (9th Cir. 1981).  "Because 'the actual act of

14  copying is rarely witnessed, copying is ordinarily established indirectly.'"  *Jordan-Benel v.*

15  *Universal City Studios, Inc.*, 2015 WL 3888149, at *9 (C.D. Cal. June 24, 2015) (quoting *Kamar*

16  *Int'l*, 657 F.2d at 1062).  As such, "'the plaintiff must establish infringement by showing both

17  access to its copyrighted material on the part of the alleged infringer and substantial similarity

18  between the copyrighted work and the alleged infringing work.'"  *Kwan Software Eng'g, Inc. v.*

19  *Foray Techs., LLC*, 2014 WL 572290, at *11 (N.D. Cal. Feb. 11, 2014) (quoting *N. Coast Indus.*

20  *v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1033 (9th Cir. 1992)).

21         Plaintiff's FAC describes with sufficient particularity the works that Defendant allegedly

22  infringed – the HTML code – and the work that allegedly infringed them – Defendant's search-

23  results page.  *See Richtek Tech. Corp. v. UPI Semiconductor Corp.*, 2011 WL 166292, at *2 (N.D.

24  Cal. Jan. 19, 2011) (dismissing copyright infringement claim under 12(b)(6) where complaint

25  failed to "provid[e] any factual allegations to identify [the defendant's] allegedly infringing acts or

26  works").  Plaintiff also alleges Defendant's "Results Page is substantially similar to the

27  copyrighted Media.net Results Pages" and provides a line-by-line comparison of Plaintiff's and

28  Defendant's HTML codes.  FAC ¶¶ 43, 47.

**United States District Court**
For the Northern District of California

1    The problem is that the FAC fails to set forth facts that explain how Defendant copied the

2    copyrighted material.  Plaintiff's FAC does not describe how Defendant had access to Plaintiff's

3    HTML code.  It instead makes conclusory assertions that Defendant copied the HTML code from

4    Plaintiff's search results pages and does not explain how Defendant had access to it.  *See Jordan-*

5    *Benel*, 2015 WL 3888149, at *10 ("To allege access, [the p]laintiff must allege facts suggesting a

6    'reasonable opportunity' or 'reasonable possibility' of viewing the plaintiff's work." (quoting

7    *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000)).  In addition, the FAC does

8    not list every portion of Plaintiff's HTML code that Defendant allegedly infringed.  At the

9    hearing, counsel for Plaintiff represented that the list contained in the FAC is not an exclusive list,

10   but merely provides examples of the alleged infringement.  *See* FAC ¶ 47.  Given this

11   representation, it appears there may be other portions of the HTML code that Defendant allegedly

12   copied.  Dismissal is thus warranted as Plaintiff fails to identify which sections it alleges

13   Defendant copyrighted.  *See Reinicke v. Creative Empire*, 2013 WL 275900, at *6-7 (N.D. Cal

14   2013 Jan. 24, 2013) (dismissing complaint where the plaintiff failed to identify which portions of

15   the work the defendant allegedly infringed).

16          The Court grants Defendant's motion to dismiss but grants Plaintiff leave to amend to

17   identify each portion of the HTML code Defendant allegedly infringed and to allege facts

18   regarding Defendant's access to Plaintiff's HTML code.

19   C.     State Law Claims

20          Defendant also argues the Court should dismiss Plaintiff's state law claims because the

21   Copyright Act preempts those claims.  Mot. at 17-19.  Plaintiff asserts three claims under

22   California law: (1) intentional interference with business contract, (2) intentional interference with

23   prospective business relationship, and (3) violation of California's Unfair Competition Law

24   ("UCL"), California Business and Professions Code section 17200 et seq.  FAC ¶¶ 94-123.

25          "It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art.

26   VI, cl. 2, invalidates state laws that interfere with, or are contrary to, federal law."  *Hillsborough*

27   *Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (quotations omitted).

28   Congress may, for instance, "pre-empt state law by so stating in express terms."  *Id.*  Such is the

case in the Copyright Act, which explicitly preempts

> all legal or equitable rights that are equivalent to any of the
> exclusive rights within the general scope of copyright as specified
> by section 106 in works of authorship that are fixed in a tangible
> medium of expression and come within the subject matter of
> copyright as specified by sections 102 and 103.

17 U.S.C. § 301(a); *see Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 760 (9th Cir.) cert. denied,
136 S. Ct. 267 (2015) ("'[The [exclusive] rights protected under the Copyright Act include the
rights of reproduction, preparation of derivative works, distribution, and display.'" (quoting *Altera
Corp.* v. *Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th Cir. 2005)).

"Copyright preemption is both explicit and broad: 17 U.S.C. § 301(a) prohibits state-law
protection for any right equivalent to those in the Copyright Act." *G.S. Rasmussen & Assoc., Inc.
v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 904 (9th Cir. 1992). However, "[c]opyright law does
not preempt state laws with respect to 'activities violating legal or equitable rights that are not
equivalent to any of the exclusive rights within the general scope of copyright as specified by
section 106.'"[7] *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1150 (9th Cir. 2008)
(quoting 17 U.S.C. § 301(b)(3)). Two conditions must be met in order for the Copyright Act to
preempt a state law. *Id.* "'First, the content of the protected right must fall within the subject
matter of copyright as described in 17 U.S.C. §§ 102 and 103. Second, the right asserted under
state law must be equivalent to the exclusive rights contained in section 106 of the Copyright

---

[7] Under 17 U.S.C. § 106, the owner of a copyright has the exclusive right

> (1) to reproduce the copyrighted work in copies or phonorecords; (2)
> to prepare derivative works based upon the copyrighted work; (3) to
> distribute copies or phonorecords of the copyrighted work to the
> public by sale or other transfer of ownership, or by rental, lease, or
> lending; (4) in the case of literary, musical, dramatic, and
> choreographic works, pantomimes, and motion pictures and other
> audiovisual works, to perform the copyrighted work publicly; (5) in
> the case of literary, musical, dramatic, and choreographic works,
> pantomimes, and pictorial, graphic, or sculptural works, including
> the individual images of a motion picture or other audiovisual work,
> to display the copyrighted work publicly; and (6) in the case of
> sound recordings, to perform the copyrighted work publicly by
> means of a digital audio transmission.

**United States District Court**
For the Northern District of California

Act.'" *Id.* (quoting *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003 (9th Cir. 2001). In other words, "[i]f a state law claim includes an 'extra element' that makes the right asserted *qualitatively different* from those protected under the Copyright Act, the state law claim is not preempted by the Copyright Act." *Altera Corp.*, 424 F.3d at 1089 (emphasis added). The extra element in state law must effectively change "the nature of the action so that it is qualitatively different from a copyright infringement claim." *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1440 (9th Cir. 1993) (quotations and edits omitted).

Defendant makes the same argument as to each of the three state law claims: "[t]he gravamen of all three challenged [state] claims is the alleged misappropriation of Plaintiff's intellectual property (*i.e.*, its 'source code, design and look and feel' of its Search Results Page)." Mot. at 18 (citing FAC ¶¶ 2, 6, 98, 109, 118). In response, Plaintiff argues its claims include extra elements that prevent preemption, though it does not specify what those elements are. Opp'n at 18-19. Plaintiff further contends the Copyright Act does not address Plaintiff's contracts with third parties. *Id.*

As established earlier, Plaintiff's HTML code is within the subject matter of copyright. *See Brackett v. Hilton Hotel Corp.*, 619 F. Supp. 2d 810, 822 (N.D. Cal. 2008) (finding subject matter of intentional interference with contract claim was plaintiff's painting, a copyrightable work under 17 U.S.C. § 102 and the basis for plaintiff's copyright infringement claims); *Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1124-25 (N.D. Cal. 2001) (finding computer program fell within scope of 17 U.S.C. §§ 102 and 103 and thus satisfied first prong of preemption test). As such, the first prong of the preemption test is satisfied. Whether the Copyright Act preempts Plaintiff's state law claims therefore depends on whether the asserted right is qualitatively different than those protected by the Copyright Act.

a.   <u>Intentional Interference Claims</u>

A plaintiff who seeks to prevail on a claim of intentional interference with a contract under California law must prove

(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional

20

acts designed to induce a breach or disruption of this contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting economic damage.

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

The Sixth Circuit has stated that "[g]enerally, tortious interference claims (with contract or prospective economic advantage) are held to be preempted because the rights asserted in such claims are not qualitatively different from the rights protected by copyright." *Stromback v. New Line Cinema*, 384 F.3d 283, 306 (6th Cir. 2004) (collecting cases). The *Stromback* court followed this reasoning to likewise find the Copyright Act preempts a tortious interference claim that "is based upon activity which constitutes copyright infringement . . . because it is not 'qualitatively different' from a copyright infringement claim." *Id.* at 307.

The Second Circuit has also held that the Copyright Act preempt a claim of tortious interference with contractual relations because "[i]n both cases, it is the act of unauthorized publication which causes the violation. The enjoyment of benefits from derivative use is so intimately bound up with the right itself that it could not possibly be deemed a separate element." *Harper & Row Publishers, Inc. v. Nation Enter.*, 723 F.2d 195, 201 (2d Cir. 1983) *rev'd on other grounds*, 471 U.S. 539 (1985). These rights are so inextricably linked that "[i]f there is a qualitative difference between the asserted right and the exclusive right under the Act of preparing derivative works based on the copyrighted work, [the court is] unable to discern it." *Id.* Put another way,

> [i]nsofar as unauthorized reproduction, distribution, performance, or display causes the plaintiff to lose the benefits that would flow from an actual or prospective contract whereby plaintiff would authorize any such acts, the rights created by the tort of contract interference to the text of the note do not appear to differ qualitatively from rights under copyright; copyright also contemplates loss of actual or prospective contract benefits by reason of such unauthorized acts. Pre-emption in this context would, then, appear to be justified. The fact that the tort, unlike copyright infringement, requires awareness of the conflicting contract and an intentional interference with it merely means that the state-created right is narrower than its copyright counterpart, not that it is qualitatively different so as to preclude pre-emption.

1 Nimmer on Copyright § 1.01. In short, the core of the state claim on which the state claim is

1    based depends is the copyright violation.

2           Although the Ninth Circuit has not had the occasion to expressly embrace the Second and

3    Sixth Circuits' approach to copyright preemption, there appears to be no Ninth Circuit precedent

4    to the contrary.[8]  The instances where the Ninth Circuit has considered and found against

5    preemption are inapposite.  In *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079 (9th Cir. 2005), the

6    plaintiff manufactured semiconductor chips which customers, using the plaintiff's software, could

7    program to perform various logic functions.  *Id.* at 1081-82.  In order to use the software,

8    customers agreed to the terms of a license agreement that limited the use of the software to "the

9    sole purpose of programming logic devices manufactured by [the plaintiff] and sold by [the

10   plaintiff] or its authorized distributors[.]"  *Id.* at 1082.  Customers using the plaintiff's software

11   created a bitstream, a file containing information on the chip's use.  *Id.*  The defendant was a

12   competing manufacturer of semiconductor chips, but it used a different business model.  *Id.*

13   Rather than using its own software to program customers' chips, the defendant asked its customers

14   to use the plaintiff's software and send the bitstream to the defendant, which the defendant then

15   used to create a chip that was compatible with the plaintiff's products.  *Id.*  The plaintiff asserted,

16   among others, a copyright infringement claim and a state law claim of intentional interference

17   with contractual relations.  *Id.*  The latter claim was based on the plaintiff's allegation that the

18   defendant caused customers to use the plaintiff's software in violation of the license agreement by

19   providing the bitstream to the defendant.  *Id.* at 1089.

20          The Ninth Circuit held that the Copyright Act did not preempt the plaintiff's intentional

21   interference with contract claim.  *Id.* at 1089.  Specifically, the "state law intentional interference

22   claims based on the 'sole use' provision . . . included an 'extra element' not included within the

23   Copyright Act's protections."  *Id.* at 1089.  The court specified that "[t]he right at issue is not the

24   reproduction of the software as [the plaintiff] argues, but is more appropriately characterized as

25   the use of the bitstream."  *Id.*  The court thus held that "[a] state law tort claim concerning the

26   unauthorized use of the software's end-product is not within the rights protected by the federal

27

28   _____
     [8] Indeed, no circuits have held to the contrary.

United States District Court
For the Northern District of California

Copyright Act." *Id.* at 1090.  In short, the core of the state claim was a licensing violation rather than a copyright violation.

The Ninth Circuit addressed again addressed this issue in *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 957 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g*, 2011 WL 538748 (9th Cir. Feb. 17, 2011). Like *Altera*, *MDY Industries* involved a license agreement which prohibited users of an online computer game from using robots or "bot" to play the game.[9] *Id.* at 938.  The defendant, the game's creator, filed a countersuit against the plaintiff, a distributor of a software bot that played early levels of the game, and alleged copyright infringement and tortious interference with contract.  *Id.* at 935-36.  The court "conclude[d] that since [the game's creator sought] to enforce contractual rights (*i.e.*, not to "use . . . bots . . . or any other third-party software designed to modify the [game's] experience."  *Id.* at 938) that are not equivalent to any of its exclusive rights of copyright, the Copyright Act d[id] not preempt its tortious interference claim."  *Id.* at 957.

*Altera Corporation* and *MDY Industries* are distinguishable from the instant action.  Both involved a breach of a licensing agreement where the copyright holder limited the party's use a copyrighted work to specific circumstances, and a third party used the copyrighted work outside that scope of the license.  *See Altera Corp.*, 424 F.3d at 1082 (agreement restricting use of plaintiff's software to plaintiff's products); *MDY Indus.*, 629 F.3d at 938 (agreement prohibiting players from using robots to play game).  The Ninth Circuit could therefore look to specific provisions of those agreements that created rights in the parties.  The contractual rights at issue were qualitatively different and not the equivalent of a copyright infringement claim; thus, the Copyright Act did not preempt such state law claims.  *See Altera Corp.*, 424 F.3d at 1089; *MDY Indus.*, 629 F.3d at 957; 17 U.S.C. § 106.

Unlike *Altera Corporation* and *MDY Industries*, Plaintiff's claim of tortious interference is

---

[9] That provision stated "You agree that you will not . . . (ii) create or use cheats, bots, 'mods,' and/or hacks, or any other third-party software designed to modify the World of Warcraft experience; or (iii) use any third-party software that intercepts, "mines," or otherwise collects information from or through the Program or Service."  *MDY Indus., LLC*, 629 F.3d at 938 (edits in the original).

**United States District Court**
For the Northern District of California

not based on Defendant's breach of contract or licensing agreement; the core of Plaintiff's claim is based on copying its registered HTML code in violation of Plaintiff's copyright. Hence, the Ninth Circuit's acknowledgement that "[m]ost courts have held that the Copyright Act does not preempt the enforcement of contractual rights" is inapplicable to this case. *Altera Corp.*, 424 F.3d at 1089. The right at issue is not a contract right, but rather Plaintiff's right to reproduce its copyrighted HTML code. Because the Copyright Act protects that right, the nature of Plaintiff's intentional interference with contract claim is not qualitatively different from its copyright infringement claims.[10]

To the extent Plaintiff argues there is an extra element of intent, Plaintiff still cannot avoid preemption. The question is whether the added element *qualitatively* changes the nature of the claim. *See Altera Corp.*, 424 F.3d at 1089. Defendants' alleged intent does not qualitatively change the nature of the claim here which is predicated on a copyright violation. *See Worth v. Universal Pictures, Inc.*, 5 F. Supp. 2d 816, 822 (C.D. Cal. 1997) (finding additional element of intent did not change nature of intentional interference with prospective economic advantage claim, such that "[the] claim [was] directly related to copyright infringement, the subject area of the Copyright Act."); *Zito v. Steeplechase Films, Inc.*, 267 F. Supp. 2d 1022, 1027 (N.D. Cal. 2003) ("[C]onversion claims generally are preempted even though there is an additional element of intent. [] The extra element in a conversion claim does not necessarily change the nature of the underlying rights at issue." (citation omitted)); *Firoozye*, 153 F. Supp. 2d at 1125-26 ("Generally speaking, the defendant's allegedly wrongful intent does not add an element qualitatively changing the state claim from one of unauthorized copying[.]" (quotations omitted)).

Accordingly, the Court finds the Copyright Act preempts Plaintiff's intentional

---

[10] Plaintiff's reliance on *Brackett v. Hilton Hotels Corp.*, 619 F. Supp. 2d 810 (N.D. Cal. 2008), where the court found the Copyright Act did not preempt the plaintiff's state law claims of intentional interference with prospective economic advantage and contract relations, is misplaced. In *Brackett*, the defendant had permission to purchase the plaintiff's artwork, but was explicitly prohibited from reproducing or selling them. *Id.* at 814. He exceeded the scope of his permitted use of the work when he reproduced them and sold them to a hotel, despite the fact the plaintiff had expressly forbidden him to do so. *Id.* at 814-15. The case is analogous to *Altera Corp.* and *MDY Industries* in that the core violation was a breach of contractual limitation owed to the plaintiff.

1  interference with contract claim.

2          b.       Intentional Interference with Prospective Business Relationship

3        In order to establish a claim of intentional interference with prospective economic

4  advantage,[11] a plaintiff must show

5

6        (1) an economic relationship between the plaintiff and a third party,
   with a probability of future economic benefit to the plaintiff; (2) the
   defendant's knowledge of this relationship; (3) intentional and
7  wrongful conduct on the part of the defendant, designed to interfere
   with or disrupt the relationship; (4) actual disruption or interference;
8  and (5) economic harm the plaintiff as a proximate result of the
   defendant's wrongful conduct.

9

10  *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 713 (2007).  Plaintiff

11  argues this claim should not be preempted because in addition to infringing Plaintiff's copyrights,

12  Defendant also interfered with Plaintiff's existing contractual relations with Microsoft.  Opp'n at

13  24.  Plaintiff contends that it "may . . . pursue a claim . . . for intentionally interfering with

14  prospective economic relations in an independently wrongful manner by violating the UCL."  *Id.*

15        The Court disagrees that this is sufficient to avoid preemption.  Like the previous claim,

16  Plaintiff's intentional interference with economic advantage claim is predicated on Defendant's

17  unauthorized copying of Plaintiff's HTML code, in violation of its statutory rights under the

18  Copyright Act.  *See* 17 U.S.C. § 106.  As a result, it is not qualitatively different from Plaintiff's

19  copyright infringement claims.  *See Stromback*, 384 F.3d at 307 ("The bottom line is that the

20  foundation of [the] claim is . . . violation of rights that are granted under and protected by the

21  Copyright Act.").  Nor are there extra elements to the claim that qualitatively change its nature.

22  *See Aagard v. Palomar Builders, Inc.*, 344 F. Supp. 2d 1211, 1219 (E.D. Cal. Nov. 16, 2004)

23  (rejecting argument that loss of business resulting from defendant's sale of plaintiff's copyrighted

24  work was extra element to intentional interference with prospective economic relations claim

25  because "federal copyright laws already protect the exclusive right of distribution.").  As such, the

26

27  ───────────────

[11] The FAC describes this claim as intentional interference with business relationship.  FAC ¶¶
28  105-16.  In its Reply, Plaintiff refers to the claim as one of intentional interference with
   prospective economic advantage.  Reply at 23-24.

1    Court finds the Copyright Act preempts Plaintiff's intentional interference with prospective

2    economic advantage claim.

3                 c.      California Business and Professions Code section 17200

4       The UCL broadly prohibits "any unlawful, unfair, or fraudulent business act or practice."

5    Cal. Bus. & Prof. Code § 17200. "By proscribing 'any unlawful' business practice, section 17200

6    borrows violations of other laws and treats them as unlawful practices that the unfair competition

7    law makes independently actionable." *Cel-Tech. Comm., Inc. v. Los Angeles Cellular Tele. Co.*,

8    20 Cal. 4th 163, 180 (1999) (quotations omitted). "Because the statute is written in the

9    disjunctive, it is violated where a defendant's act or practice violates any of the foregoing prongs."

10    *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012). A determination of whether

11    the Copyright Act preempts a UCL claim "requires analysis of each theory of unfair competition

12    to determine whether it contains the necessary qualitatively different extra element distinguishing

13    it from copyright . . . protection." *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d

14    1434, 1440 (9th Cir. 1993) (quotations and edits omitted).

15       Plaintiff asserts violations of all three prongs.[12] FAC ¶ 122. "To the extent that Plaintiff

16    brings this [UCL] claim based on conduct involving subject matter covered by the Copyright Act,

17    the claim is preempted if it implicates rights contained in that Act." *Sleep Sci. Partners v.*

18    *Lieberman*, 2010 WL 1881770, at *10 (N.D. Cal. May 10, 2010). The Ninth Circuit addressed

19    this issue in *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209 (9th Cir. 1998). The plaintiff in

20    *Kodadek* asserted a UCL claim based on the defendant's allegedly unauthorized publication and

21    sale of the plaintiff's copyrighted drawings. *Id.* at 1212-13. The Ninth Circuit held that the

22    plaintiff "expressly base[d] his unfair competition claim on rights granted by the Copyright Act."

23    *Id.* at 1213. In particular, the court noted the Copyright Act grants a copyright's holder the right to

24    reproduce, distribute, and display the work, as well as the right to prepare derivative works. *Id.*

25    (quoting 17 U.S.C. § 106). Publication and sale are two acts that fell within the scope of those

26

27    [12] The FAC asserts "Defendant['s] conduct constitutes unlawful, unfair, or fraudulent business acts or practices and is therefore unfair competition in violation of California Business and

28    Professions Code § 17200." *Id.* ¶ 122. In its Opposition, however, Plaintiff only addresses the unfair and unlawful prongs. *See* Opp'n.

United States District Court
For the Northern District of California

rights.  As such, the court found "it [was] clear that [the plaintiff's] state law unfair competition claim [was] based solely on rights equivalent to those protected by the federal copyright laws" and the Copyright Act preempted the UCL claim.  *Id.*

Plaintiff concedes there is preemption to the extent the state law claim is based on copyright infringement, but it argues its UCL claim is not based solely on Defendant's copyright infringement.  Opp'n at 22.  However, the FAC asserts "Defendant['s] unauthorized copying and use of Media.net's Results Pages' material for the purpose of competing with Media.net and seeking business from Media.net's customers harmed Media.net's business, reputation, and competitive standing in the contextual advertising business."  FAC ¶ 118.  This conduct, Plaintiff contends, "constitutes unlawful, unfair, or fraudulent business acts or practices and is therefore unfair competition in violation of California Business and Professions Code § 17200."  *Id.* ¶ 122.  The FAC does not allege a UCL violation that does not depend on copying in violation of the Copyright Act.  Plaintiff does not include any additional allegations or facts in the UCL claim that are not asserted in its copyright infringement or state law claims.  *See Young Money Entm't, LLC v. Digerati Holdings, LLC*, 2012 WL 5571209, at 9 (C.D. Cal. Nov. 15, 2012) (finding Copyright Act preempted UCL claim where plaintiff did not allege additional fact but merely incorporated facts regarding copyright infringement).  "Where, as here, 'the improper business act complained of is based on copyright infringement,' a UCL claim is 'properly dismissed because it is preempted.'"  *Epikhin v. Game Insight N. Am.*, 2015 WL 2412357, at *5 (N.D. Cal. May 20, 2015) (quoting *Sybersound*, 517 F.3d at 1152).  To the extent Plaintiff's UCL claim is based on its intentional interference claims, the Court has found the Copyright Act preempts those claims.  Because the Copyright Act preempts these claims when they are asserted independently, they cannot also provide a basis for a UCL without escaping preemption.  Accordingly, the Court finds the Copyright Act preempts Plaintiff's UCL claim.

D.    Motion for More Definite Statement

Rule 12(e) allows a party to "move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."  Fed. R. Civ. P. 12(e).  "If a pleading fails to specify the

allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under [Federal Rule of Civil Procedure] 12(e) before responding." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Rule 12(e) motions are "disfavored and [are] proper only if the complaint is so indefinite that the defendant cannot ascertain the nature of the claim being asserted." *Craigslist, Inc.*, 2009 WL 890896 at *4. Rule 12(e) motions are "'ordinarily restricted to situations where a pleading suffers from unintelligibility rather than want of detail.'" *Medrano v. Kern Cnty. Sheriff's Officer*, 921 F. Supp. 2d 1009, 1013 (E.D. Cal. 2013) (quoting *Dri-Eaz Prod., Inc. v. Nguyen*, 2012 WL 1537598, at *1 (W.D. Wash. May 1, 2012)).

In the alternative, Defendant seeks a more definite statement pursuant to Federal Rule of Civil Procedure 12(e). Mot. at 23. As the Copyright Act preempts Plaintiff's state law claims, the Court only addresses Defendant's request with regard to the copyright claims. Defendant argues "Plaintiff should be compelled to make a straightforward substantive and understandable to the Court statement of the basis for its claims." *Id.* at 24. However, Plaintiff's FAC does not sink to the level of unintelligibility that Defendant so claim. The FAC is coherent enough such that Defendant can ascertain "a fair idea of the basis of the complaint and legal grounds claimed for recovery." *Whiteway v. FedEx Kinko's Office & Print Serv., Inc.*, 2005 WL 3095864, at *2 (N.D. Cal. Nov. 14, 2005). Defendant's Motion in fact demonstrates that it is aware of the basis of Plaintiff's claims—namely, the alleged infringement and misappropriation of Plaintiff's HTML code. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.15 (1973) (party could have moved for more definite statement if "allegations . . . were wholly barren of specifics"). "The inability to ascertain all of the facts from a complaint is not an adequate ground for a more definite statement, as these concerns can be addressed through discovery." *Whiteway v. FedEx Kinko's Office & Print Serv., Inc.*, 2005 WL 3095864, at *1 (N.D. Cal. Nov. 14, 2005).

In any event, in the one aspect in which the Court has found the FAC incomplete – failure to identify which portions of the HTML code Defendant is alleged to have copied and the facts regarding Defendant's access to the code – the Court has granted Defendant's motion to dismiss with leave to amend. This moots Defendant's motion for a more definite statement. It is therefore

28

denied.

### V.      CONCLUSION

For the foregoing reasons, the Court **DENIES** (1) Defendant's Motion for Summary Judgment as to Plaintiff's copyright infringement claims and (2) Defendant's Motion for a More Definite Statement.  However, the Court **GRANTS** (1) Defendant's Motion to Dismiss the copyright infringement claims with leave to amend and (2) Defendant's Motion to Dismiss Plaintiff's state law claims with prejudice, except that Plaintiff may amend its UCL claim to the extent it can allege such a claim independent of a copyright violation.

This order disposes of Docket No. 36.


**IT IS SO ORDERED**.


Dated: January 12, 2016

_____
EDWARD M. CHEN
United States District Judge