**Pages 1 - 35**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

Media.Net Advertising FZ-LLC,  )
 )
 )
        Plaintiffs,  )
 )
  VS.      )      NO. C 14-03883 EMC
 )
Netseer, Inc.,  )
 )
        Defendants.  )
 )

San Francisco, California
Friday, July 15, 2016

**TRANSCRIPT OF PROCEEDINGS**

<u>**APPEARANCES**</u>:

For Plaintiffs:

    NEWMAN DU WORS, LLP
    1900 Powell Street, Ste. 603
    Emeryville, CA 94608
  **BY:  LEEOR NETA**
      **ATTORNEY AT LAW**

For Defendants:

    PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
    2550 Hanover Street
    Palo Alto, CA 94304-1115
  **BY:  VERNON H. GRANNEMAN**
      **ATTORNEY AT LAW**

Reported By:     Rhonda L. Aquilina, CSR #9956, RMR, CRR
         Official Court Reporter

**Friday - July 15, 2016**                                **10:15 a.m.**

### P R O C E E D I N G S

### ---000---

THE CLERK:  Calling civil action C-14-3883, Media.Net Advertising versus NetSeer, Inc.

Counsel, please state your appearances.

MR. NETA:  Good morning, Your Honor.  Leeor Neta for the plaintiff Media.Net.

THE COURT:  Thank you, Mr. Neta.

MR. GRANNEMAN:  Good morning, Your Honor.  Vernon Granneman appearing for defendant NetSeer, moving party.

THE COURT:  All right.  Thank you, Mr. Granneman.

On the first issue, which is whether the Second Amended Complaint complies with my order in which I indicated that the deficiency of the prior complaint was that it needed to list every portion of plaintiff's HTML code that defendant allegedly infringed.  And, again, we have the representative table, but that table has not been expanded, and so the only material difference is paragraph 60 which alleges that the engineer viewed and copy all or substantial portions of the Media.Net results page source code.

Now, if it just said all, each and every portion, I guess that would -- that's one way of sort of stating and identifying meets and bounds of this claim here, but when it says "substantial portions," I'm still left with the indefiniteness

problem, and therefore it does not address what I had ordered. So explain yourself.

MR. NETA:  I understand, Your Honor.  The intention is, when we filed the Second Amended Complaint, was to -- and in our response to the motion -- was to draw the Court's attention to the exhibits that we attached to the complaint, which Exhibits C, D, and E are the code for the landing pages, C and D are the code for the landing pages that were created by Media.Net, and E is the code for the landing page created by NetSeer.  And a comparison of those pages indicate that substantially all of the code that was contained in both C and D, which were created by Media.Net, is contained within the code base that was created by NetSeer, which is in E.

It's our contention that these exhibits make clear that NetSeer copied substantially all of Media.Net's copyrighted code.

THE COURT:  So you added D and E which weren't part of the first complaint.

MR. NETA:  These were part of the initial -- this was part of the initial complaint in the First Amended Complaint where we attempted to direct the Court's attention more closely to those exhibits, so that the Court could see that as compared with C and D, E is substantially the same.

In the interim, Your Honor, we were also able to take the deposition of NetSeer's vice-president of engineering, who is

the individual who is responsible for copying the code, and was one of the people that helped found NetSeer, and he made four admissions under oath.  First, he testified that he didn't have much experience creating the landing pages at all.  He personally also admitted that he personally copied the Media.Net code for use in NetSeer's landing page, and he admitted that that was done in direct violation of his employment agreement.  He also admitted that he copied the code to save him time from having to create his own landing page. And then only a few parts of the code -- we actually compared the code attached to the complaint to copies of code that NetSeer's counsel and NetSeer has produced to us in the interim, their own production of code base.  We compared those two code bases and highlighted all the sections where there are similarities, and we placed that document in front of the vice-president of engineering who copied -- who personally copied the code, and he admitted that each of the sections and each of the lines that were highlighted were actually copied.

And then afterward I asked Mr. Khajehnouri, the vice-president of engineering, if he could explain for us what was contained in that code base other than what was copied, and he said it was really only two things:  The logic associated with NetSeer's method for pulling and ordering search results, and a bit of background imagery.  The rest of the code was copied from Media.Net, and that's based on NetSeer's own

production of its code base.

THE COURT:  How does this all address my order, right or wrong, that I'm going to require that whatever is going to be placed in contention here, given the narrowness of what's copyrightable -- I mean, this is not your typical case.  I mean, the look and feel is not copyrightable, the general structure is not copyrightable.

MR. NETA:  Agreed.

THE COURT:  So, frankly, I'm still wondering what is this case about.  You get relief -- let's say you get relief, injunctive relief that they can't use the same class, you know, name, et cetera, et cetera.  So what?

But that's another issue.  That's one reason why I required that there be some specificity.

And I gave you a second chance and, from what I can see, nothing has changed other than the one sentence which really adds nothing.  If it said "all" on every single thing, and here it is attached as Exhibit D or E, then maybe that's something different, but it says "all or substantial portions."  It still doesn't tell you anything in terms of the whole purpose of notice and narrowing the issues for the Court.

So my view is that I've given you a chance, and I'm inclined, frankly, to say, well, what you've identified in a table is it, what's in this complaint is it.  That's a scope of the copyright claim in this case.

**MR. NETA:** Understood, Your Honor.

Another proposal, if I may be indulged for just one minute. The vice-president of engineering who worked for NetSeer, who personally copied the code, has now looked at the code base that NetSeer has since produced to us, but produced to us after we were able to file the Second Amended Complaint, and we have since compared that with the code base that Media.Net had created, and, as testified, specifically about what he copied and what was left out.

So I can go far beyond this point what I think would be required at the pleading stage in terms of telling you line by line specifically what was copied.

If the Court would indulge, I'd be happy to file a third amended complaint that would specifically provide for you those lines of code now that we've obtained that testimony. Again, that was something that was difficult to do at the outset, because the only thing that we had at the outset was NetSeer's landing page code at the time that it existed when we filed the complaint, and we drew those comparisons and provided what we could from the table in there.

**THE COURT:** And from which you could infer, given the access that you've alleged and everything else, the copyright claim which you have.

**MR. NETA:** Right.

**THE COURT:** So, I mean, I have a simple question. Now

that you have something that sounds like an admission, you've got the smoking gun, or whatever it is, maybe more than a smoking gun in terms of proof of the case, but in terms of the ability to identify, I don't know why the table that you provided, the exemplary table could not have simply been expanded with the information you have.  When you say, "The following table shows examples," well, instead of "examples," you should say the infringement may have been long, it may have made this a long complaint, but -- so I guess, you know, there's a question of did you have the ability to allege at the time of the Second Amended Complaint a more complete or a complete version of everything you claim was violative of your client's copyright.

And I don't see -- I understand now you have, you know, apparently some pretty strong evidence of actual copying, which you will have to prove at trial, but that doesn't answer the question about the pleadings.

**MR. NETA:**  I understand.  And I appreciate if Your Honor wants to proceed with simply holding us to what's contained within the table, which I think is by and large sufficient.  But I will say this if I may, Your Honor, NetSeer's vice-president of engineering, again under oath, testified that he specifically recommended that NetSeer copy Media.Net's code in order to gain advantage in the competition. He admitted that NetSeer acted on that recommendation, and he

twice admitted on the record that it was not the right thing to do.

**THE COURT:**  And that may go, you know, to whether or not punitive damages or enhanced damages are available, shifting of fees, I mean, willfulness, and it may inform other causes of action we're going to talk about, but that's kind of besides the point with respect to this pleading.

**MR. NETA:**  Which I understand Your Honor to mean what is the scope of the code that is copyrightable.

**THE COURT:**  Yes, that's at issue in this case, that's correct.

**MR. NETA:**  Understood.  Understood.

**THE COURT:**  Do you have any comments to add to that?

**MR. GRANNEMAN:**  Yes, Your Honor.  And I'm not going to go into the mischaracterizations of Mr. Khajehnouri's testimony are dramatic.  I'm happy to go into that in any level of detail that you want or not, but --

**THE COURT:**  I don't want to --

**MR. GRANNEMAN:**  His claims about admissions and things are just not true, so it's irritating to listen to it.

But the issue about what they had, in February of 2015, a year and-a-half ago, we served interrogatory responses on Media.Net that included the markup page with the portions that were copied highlighted.  It's 18 months ago.  So the claim that they just figured this out in a deposition on Monday of

this week is not true.  They've had this.

THE COURT:  Yeah, right.  I've already made that point, so you don't have to -- is there something new you want to add?

MR. GRANNEMAN:  No.  And so the -- I'll wait to hear what we're going to talk about on other issues.  But the question of trying to get this focused, the biggest problem I have with the Second Amended Complaint is it simply doesn't acknowledge at all the limits on the copyrightability that Your Honor specified in your January --

THE COURT:  Well, I think it's clear now after I ruled as I'm going to rule on that portion.

MR. GRANNEMAN:  Okay.  Good.

THE COURT:  That we have a defined -- I've already said what subject is copyrightable and which portions of the code are now at issue.  You have a table, and it's not going to be amorphous or something like that.  I've limited it, so now we can focus on that.

MR. GRANNEMAN:  Except that the table includes a lot of cascade style sheet.

THE COURT:  Well, I understand, but I've already said what is that's copyrightable.

MR. GRANNEMAN:  Okay.  Thank you, Your Honor.

THE COURT:  So I've identified within those tables what it is.

**MR. GRANNEMAN:** Right.  Thank you, Your Honor.

**MR. NETA:** As I recall, Your Honor, you said that the "copyright protection obtains in the entirety of the HTML code."  That language was taken directly from your Order.

**THE COURT:** Well, it's copyrightable because it contains those things, but the actual copyright cascade -- you know, we went through that whole analysis, and at the end of the day, I identified what it is within that that's copyrightable, and that will affect -- that's why I raised the question that it may affect scope or relief, or injunctive relief, it may effect apportionment and damages at the end of the day, which I raised last time, I raise it again.  I'm going to ask you also about ADR before the end of the day.

**MR. NETA:** Please.

**THE COURT:** -- what you're going to do about that. But, you know, that may limit your damages.

**MR. NETA:** Understood.

**THE COURT:** But I think we probably should address the other thing, because now we got -- you have a broader approach, and that is, under the UCL, my impression is that you're going to seek relief perhaps on a broader basis under the UCL, because that, arguably, is cause to -- you know, it's clear or perhaps affords broader monetary relief.

But my question is why isn't this simply a reverse passing off claim under a different name when you say that, well, I

took this and did not reveal where it really came from, specifically the copying exercise here, in paragraph 61 it says:  (reading)

> NetSeer used the stolen source code to replicate the appearance and design of Media.Net's Results Pages with the intent of giving itself a competitive advantage, or eliminating Media.Net's genuine competitive advantage, during Microsoft's evaluation of Netseer's services.

Why isn't that essentially a reverse passing off claim which most courts, including the Ninth Circuit, have found such claims to be preempted.

**MR. NETA:**  That's a good question, and I appreciate you giving me the opportunity to address it.

Just to unpack that briefly, Your Honor, I will say that the UCL claim isn't simply intended to enhance damages.  I think the fact that there's a -- now we have testimony with respect to willfulness and intentionality, I think that there are reasons to believe that our copyright damages are more than we initially believe them to be.

But with that said, this isn't a reverse passing off claim, because this claim doesn't involve specifically I'm only NetSeer passing off code to others under its name, knowing that it belonged to somebody else.  What we argued, and what we allege in this complaint, is that NetSeer misrepresented to Microsoft, and others, that it could provide services just as

good as Media.Net but at a lower cost, and it failed to disclose that it lacked the resources to build upon its touted technological capabilities.

**THE COURT:**  So what's the best -- direct me to the paragraphs that make that explicit, what you just said.

66:  (reading) Misrepresented to Microsoft and other clients that you could do just as well, perhaps better, at a lower cost.  Netseer failed to disclose that it lacked the same technological capabilities.

**MR. NETA:**  Yeah, that's correct, Your Honor.

**THE COURT:**  Is that the main --

**MR. NETA:**  That's correct, Your Honor.  I'm looking at essentially paragraph 66 through 76 in this respect.

And I will say, just for the record, Your Honor, that the testimony that we obtained from NetSeer's vice-president of engineering also supports our claims in this respect.

Mr. Khajehnouri, who copied the code, specifically said that the landing page was important for the competition for Microsoft's business.  He said that NetSeer wanted to do what Media.Net was doing in terms of its landing pages.  He said that NetSeer didn't have much experience creating landing pages, and he said that he didn't have time to create any unique landing page for NetSeer, nor did anyone else on his team.

So essentially NetSeer lied about its capabilities, and

now NetSeer has admitted that it has lied about its capabilities, and that's the issue that's staked on the UCL claim.  Are they materially misrepresenting to customers, Microsoft and others, about what NetSeer is able to do?  It's not about passing off code.

THE COURT:  What was the misrepresentation about its technology, other than implied in the reverse passing off aspect, that is selling this product without giving -- without admitting that it's really attributable to Media.Net's work. Is there anything else other than that, like some affirmative representation that we have the best engineers in town, or we've been doing this for years, or we have a staff of, you know, great staff that's been doing this.

MR. NETA:  As far as we can tell from the production, Your Honor, it is suggested that there were a series of communications between two employees at NetSeer:  Todd Kenny and Dennis Clerk, who had numerous conversations with representatives from Microsoft.  They admit within their communications, or internal communications within NetSeer, that they were laser-focused on doing anything to undercut Media.Net's advantage.

And we know, based on our deposition of Mr. Khajehnouri, that NetSeer was competing in this contextual advertising business that was simply part of what it otherwise also does. So it is suggested, certainly by all of the testimony and

production thus far, and that certainly will be alleged in the complaint, that NetSeer argued to Microsoft, and others, that it could essentially do what we do but better.  And that wasn't just the landing page and the look and feel.  It was about its ability to provide the same contextual advertising services and products that Media.Net does, but cheaper.

**THE COURT:**  So where is there an allegation that if you strip out just the reverse passing off, that is using this product, putting its label on it, even though it really was Media.Net's claim here, other than that, and saying what a great product this is, where is there some allegation that kind of goes beyond that one product, that one misrepresentation or implied misrepresentation other than the reverse passing off kind of inherent misrepresentation.  Where is there something here that talks about it that we can do other things too, and we provided other products, we can customize this to your -- or whatever.  Is there something else in here?

**MR. NETA:**  I think it's all contained within the third cause of action where we say that they compete in the same online contextual advertising marketplace.  They said -- they misrepresented to others that they could perform the same services, but at a lower cost.  They failed to disclose that they never developed or optimized their own pages, and that they lacked the capabilities to do so.  This is something that they now have admitted.  And the conduct described is likely to

deceive members of the public.  I mean, that's where that material misrepresentation --

**THE COURT:**  Well, if you're going to use misrepresentations, Rule 9B, you have to have some specificity here, and that's part of the problem.

**MR. NETA:**  I think NetSeer --

**THE COURT:**  That's different than this product and the misrepresentations inherent or implicit with respect to this particular product.

**MR. NETA:**  Right.

**THE COURT:**  That's the problem.  If it was just limited to this and you had nothing else, then it does look awfully like a reverse passing off claim dressed up in other -- but if it's other allegations that kind of transcend this or broader than this, then I could see where there's extra elements here, that it's not just tied to this one act of sort of passing off.

**MR. NETA:**  Right.  And I think while we would submit that there are -- that we've met the 9B standard in terms of pleading, I would also submit, Your Honor, that we don't need to specifically allege fraud in order to argue or obtain -- to meet the standard, I should say, for alleging a UCL claim.  We can also allege something that is unfair or sounds unfair in terms of anti-competitive practices.  And we would allege that it's anti-competitive, frankly, for a company to say, listen,

we do exactly what they do, but better, cheaper.  But that's simply a lie, and, in fact, we have an admission at this point that it's a lie.

We don't have specific understandings of what NetSeer said to Media.Net, but at least at this point now, Your Honor, we know who at NetSeer had those communications with folks at Microsoft, and we have an idea as to the names of the individuals at Microsoft with whom they had those communications.  And I would submit to you that those communications will likely demonstrate that NetSeer, in talking about what it could do to compete for Microsoft's business, was not simply talking about the landing page, but was talking about its ability to provide a contextual advertising engine that is better and cheaper than Media.Net, even though it knew it couldn't do that.

There are a series of communications that they produced to us in which they conduct A/B tests -- those are comparison tests against what they think that Media.Net does versus what they do, to demonstrate how well their engine is running, and repeatedly time and time again those A/B tests demonstrated that NetSeer does not perform as well as Media.Net.  And we understand from their communications that they were telling Microsoft something completely different.

THE COURT:  Well, if there are misrepresentations that are part of the cause of action, however it's labeled,

specificity is required.  If you are then saying -- and I think you are -- that you are also pleading under the unfair prong of the UCL, which can be deemed a sort of broader claim, you don't even necessarily have to show unlawfulness, because you can show unfairness just in terms of at least under some of the tests.

I guess I'd like to know exactly what is the unfairness here?  Is it -- if it's just the act of again taking this product, copying it, putting your own label under it and using it to compete, that sounds a lot like a copyright claim.  But if there's something more to it than that, so I guess that's my question, what is the more?

**MR. NETA:**  Right.  To clarify, it sounds to you, Your Honor, more like a reverse passing off claim in that sense --

**THE COURT:**  Yes.

**MR. NETA:**  -- which would be granted.  I understand that, I do.  And I'd submit that it's different, because in this case what we have is a test between three different entities, Media.Net and NetSeer - all of which competed for Microsoft's business.  We have a series of communications now that indicate that NetSeer tried to organize the tests in such a way to its advantage, so that they had an opportunity to look at Media.Net's landing page.  The vice-president of engineering recommended that they look at the landing page.  And they did do a host of other things to copy Media.Net's business.

We don't have any testimony as of yet from individuals within NetSeer about their communications with Microsoft, but what we do have is enough at this point I think to demonstrate that they were doing their darndest to try to manipulate the test to give NetSeer an unfair advantage, despite the fact that they lacked the technological capability to compete.

**THE COURT:** And when you say manipulate the test, how did they manipulate the test?

**MR. NETA:** For one, Your Honor, the test was initially run concurrently so that all of the competitors in that version of the test, Media.Net and NetSeer, were to run their products at the same time, and then NetSeer made some noises and complaints about that, and then eventually what ended up happening was that Microsoft organized the test so that NetSeer would go last, which then gave it an advantage in terms of its ability to look and evaluate how others were performing in the test.

**THE COURT:** That was a Microsoft decision?

**MR. NETA:** I believe it was something that NetSeer had suggested that Microsoft do. But, again, it's not clear at this point.

**THE COURT:** How is that -- in that act of convincing Microsoft to let it go last, thereby giving it some advantage and seeing who or what went before it, could it be an unfair business practice?

**MR. NETA:** Not taken by itself, but when placed in context I think it does. Because what we have is, as I said, evidence of numerous conversations between employees at NetSeer reaching out to employees of Microsoft, talking to them about their product, and making comparisons about their product to Media.Net that were simply untrue, and touting their capabilities.

**THE COURT:** So the untrue comparison statements, what would those have been?

**MR. NETA:** As I understand it, it would be their ability to do the same thing that Media.Net does, but better, and it's not simply just the landing page, it's the intelligence of the search results that are produced upon the page. NetSeer had created what it deems an automated contextual advertising engine that was supposed to do what Media.Net does, but automatically, and it was their belief that that system operated cheaper, but better, when in fact it did not, and their own tests demonstrate that.

**THE COURT:** So what's the harm if they made a misrepresentation, our platform is better, but then it actually didn't perform better. I mean, what's -- I guess it seems like it got disproved pretty quickly.

**MR. NETA:** It didn't, because what ended up happening is they continued to copy -- well, they continued to do essentially what Media.Net did and hold itself out as being

able to do what Media.Net did.  And as Mr. Khajehnouri --

THE COURT:  Which sounds like it's back in the reverse passing off.  I'm trying to get away from that to see what else you've got.

MR. NETA:  Right.  But the reverse passing off, I think, requires a specific misrepresentation about the fact that they own this code, that they -- that this is their code when it's not theirs, and that's not all that is at stake in this case.

THE COURT:  Is that right, that you do not have a reverse passing off claim unless there's an express assertion of ownership?

MR. NETA:  It's not a passing off claim unless the defendant is at the very least suggesting that the product that they're producing belongs to them and no one else.

THE COURT:  It can't be implied?

MR. NETA:  I suppose it could be implied, but, again, that's not what's happening in this case, Your Honor.  There is an element of a misrepresentation or deception that is not a part of the copyright -- of the copyright case.

THE COURT:  All right.  Let me get your -- why aren't there some additional elements here?

MR. GRANNEMAN:  There are no additional elements here. There are no specific fact pleading.  This is virtually verbatim, the allegations of not only the First Amended

Complaint, but the original complaint.  And I've gone through in my reply brief and listed the exact paragraphs of the original complaint and the First Amended Complaint that have similar or verbatim the same allegations.

Media.Net is finally recognizing that Your Honor has severely limited their copyright infringement claim.  They are scrambling to try to figure out a way to preserve an unfair competition claim.  They've now -- even though in their papers they talk about nothing but the fraud prong of the UCL, now in this argument they're talking about unfair business practices and trying to conflate what was originally copying of a small portion of a style sheet into you can't compete against us. You're in the contextual advertising business, but you can't go to a customer or a vendor and say we have a contextual advertising platform and it's better than Media.Net's.  I mean, it would be an unfair competition for Media.Net, I guess, to say the same thing.  I mean, to go and to say we have a better platform than yours.

There are no specific allegations here.  They are trying to hide behind these general statements about the Microsoft competition.  Mr. Neta has grossly misrepresented to you the Khajehnouri deposition.  I have a full copy of it here with me I'm happy to --

**THE COURT:**  Well, let me ask you, what about paragraph 101 that says:  (reading)

NetSeer misrepresented to Microsoft, and other clients, that NetSeer could perform services competitive with, if not better than, Media.Net's offerings, and at a lower cost.

Now, why is that something sort of different and independent of the actual copyright claim?

**MR. GRANNEMAN:**  There are no factual allegations at all from which you could figure that out.  What is different about the copying?  They have incorporated by reference all of the factual allegations from their copyright claims into the unfair competition claim.  They don't offer any additional facts beyond what they're alleging about copying and stealing the look and feel and the design of the search results page.  There are no other facts.  There's no allegation of an extra element, and Mr. Neta is not able to articulate one for you right now.

And that same type of allegation, if you go to the *NetApp* case that we cite -- yes, *NetApp versus Nimble Storage* -- when NetApp attempted to preserve its unfair competition claim, they make the same type of an argument.  Let me just find it here, and I'll tell you the exact language.  I'm sorry.  I thought I had --

**THE COURT:**  This is page 9 of your brief.

**MR. GRANNEMAN:**  Page 9 of the brief, that's it, where the argument they left in "just like NetApp, but cheaper," and

the Court said that's not sufficient.  That's all they've done here.

The idea that -- if we misrepresented something to Microsoft, tell us what it is.  We did nothing -- it's nothing more than by implication.  There is not a shred of testimony in Mr. Khajehnouri's deposition that suggests that anybody misrepresented anything to Microsoft.  There is no evidence of misrepresentations.

Microsoft is a big company.  They were running this comparison test -- they were doing comparisons of these three companies, and one element of that was a landing page, and there's not any evidence at all that anyone even discussed with Microsoft the NetSeer landing page or the Media.Net landing page, that there's any conversation much less a representation that was not true.

THE COURT:  All right.  I'll give you a chance to respond to that.

MR. NETA:  I'm happy to speak to that issue, Your Honor.

I think the testimony of Mr. Khajehnouri would speak for itself, but two things.  I think we're concerned a little bit, Your Honor, am I correct, about the reverse passing off?

THE COURT:  Well, preemption, that there's nothing alleged -- at the end of the day there's nothing specifically alleged in all the elements that would seem to give rise to a

reverse passing off claim.

MR. NETA:  I understand that, but I would also submit to you, Your Honor, as we indicate in our motion, that a state reversing -- a reverse passing off claim isn't preempted where there's bodily appropriation, and bodily appropriation occurs when a party copies or uses substantially the same item.  I'm citing to the *Salim* case.

That's simply not -- that's simply not something that we -- the rabbit hole that I think we need to go down, because at the end of the day the UCL claim, in this instance, isn't about the appropriation, as I indicated.  The UCL claim is about the material misrepresentations that NetSeer made about its technological capabilities.  We now have testimony and evidence demonstrating that NetSeer lacked those technological capabilities, and it is clear that there will be further testimony and evidence to demonstrate that NetSeer lied about those capabilities to Microsoft and others.  That's all.  This is not in that sense a passing off claim or a reverse passing off claim.

THE COURT:  All right.  Well, I will look at that, but you can sense my skepticism about that, but I will take a closer look at that.

Let me just ask with respect -- actually, I have -- maybe this is a dumb question, but I'll ask anyway.

MR. NETA:  No such thing.

**THE COURT:**  I take it that you cannot, because of preemption, fashion a UCL claim just based on look and feel. In other words, if it's look and feel that's deemed not copyrightable, can you kind of end around that exception to copyright law and say, well, they copied the look and feel and passed it off, or whatever, you know, it's not a copyright violation, because it's not copyrightable, but can you have a state law UCL-type claim based on look and feel?

**MR. NETA:**  I would submit that you can, Your Honor. Because look and feel, as we've discussed many times throughout the course of this case, look and feel itself is not copyrightable; it's not something that comes within the scope of rights that are protected by the Copyright Act.  So if one were to fashion, hypothetically speaking, the UCL claim predicated only on the copy of a competitor's look and feel and allege that that competitor who copied that look and feel lied about the fact that it -- about the origins of that look and feel and its abilities to create something of that look and feel, I'd submit to Your Honor that that claim in and of itself is not granted by copyright, because look and feel itself is not copyrightable.

**THE COURT:**  So what about that?  It seems a little odd.

**MR. GRANNEMAN:**  Your Honor, I think I've read every case on the subject that exists, and there's no case law out

there that supports this idea.  The notion --

THE COURT:  He said the opposite, because it's expressly excluded, and that we're kind of arguably not protected by copyright law, you -- there's some kind of preemption you can't end run that -- the limited scope of copyright protection and use that same conduct which is not actionable under federal law, but make it actionable under state law.

MR. GRANNEMAN:  I've certainly not seen any, any authority that would support that idea.  I just haven't seen anything along those lines, but I did -- in our opening brief we address the issues about look and feel.

I mean, remember back on the summary judgment motion we -- we expected, based on the allegations of the First Amended Complaint and the original complaint, which were littered with allegations of look and feel and theft of look and feel, that that's what they were relying on, that they were claiming we have some protection in the look and feel.  We then get to the summary judgment motion, and Mr. Neta concedes that look and feel was not copyrightable, and that look and feel was irrelevant to the case.

In fact, though, just as a technical point, the items that Your Honor has found were copyrightable content, the class names and the comments, those two things don't have any effect on the look and feel of the web site.  The class name is a

placeholder for advertiser information.  The advertiser information ends up on the -- displayed on the screen, but not the class name.  And as you know, as the Court observed in your order, the class name could have been anything.  Instead of being Response Link, it could have been ABC.  So it has no effect on look and feel.

There is no allegation that anyone has ever seen this literary work that was copied that is comprised of class names and -- and a few comments.  Well, literally four comments.  How could there be a causal connection between any damage when there's not an allegation that anyone, a Media.Net customer, a NetSeer customer, a business partner of Media.Net or NetSeer, no one ever viewed the literary work that is copyrighted.

**MR. NETA:**  Except for NetSeer who copied them, and --

**MR. GRANNEMAN:**  Well, there's no allegation --

**THE COURT:**  Well, there's -- that's for another day. We're not at causation at this point, and damages.

**MR. NETA:**  And I will say, Your Honor, if you'll indulge me for just a second, we do allege that NetSeer copied the look and feel.  NetSeer admits that it copied the look and feel, and that to survive preemption, the UCL claim need only contain an extra element that makes the nature of the --(interruption)-- qualitatively different.

**THE COURT:**  Well, that was in there from the beginning as part of your original copyright action, and I think that's

demonstrated by the wording of your third cause of action which focuses on misrepresentation -- paragraph 101, the misrepresentation of Microsoft, about how it could perform services competitively at a lower cost, paragraph 102, failure to disclose that it never developed its own optimized search results page and lack of technical capabilities to do so, and that this conduct is likely to seep into the public.

So the look and feel paragraphs that remain in here originated really in the context of what started off being a broader copyright claim.  The UCL claim seems to be based on all the stuff that we've been talking about, about kind of misrepresenting to Microsoft and others about, you know, the quality of its ability to deliver, et cetera, et cetera.

**MR. NETA:**  I was trying to address your point that I think a look and feel -- an argument regarding the copying of look and feel, which isn't covered by the Copyright Act, is something that I think could give rise to a UCL claim.

But either way, if we're talking, Your Honor, about the 12L argument that's being made by NetSeer in its motion, I'd submit to you that these allegations regarding look and feel are absolutely material and pertinent.  They demonstrate that NetSeer intentionally copied the code in order to --

**THE COURT:**  So those are intentionality, state of mind --

**MR. NETA:**  Absolutely.

**THE COURT:** -- and potential enhanced damages, et cetera.

**MR. NETA:** Absolutely.

**THE COURT:** Even though they don't -- they cannot comprise a part of the substantive copyright claim, your argument is that they're contextual.

**MR. NETA:** They're contextual because they explain the intentionality and the willfulness that underscore the copyright infringement in the first place.

**MR. GRANNEMAN:** How can there be -- it's a lawful act to copy the look and feel. It's a lawful act. You can --

**THE COURT:** But it shows the motivation. If there's an issue of whether they actually copied or not, and the allegation is -- like motive, you know, did somebody murder somebody or not, let's find out what the motive is. And the motive provides the alleged motive to actually do the copying, and might inform -- you know, at the end of the day it's like -- first of all, if we ever do, and when we do get to a jury, it's not my practice, I don't put the complaint before the jury. It's irrelevant. They're not going to see it. So the only thing relevant for them is for pleading purposes before me, and I've already ruled. And I understand that the limits which are very -- I have drawn very strict limits on what is copyrightable here on what the claim is. So, you know, this is why generally courts disfavor motions to strike,

because if it's scandalous and libelous I guess it should be in there.  But otherwise -- or it could confuse the course of the proceedings, I could see that.  But here, I made it very clear that look and feel is not copyrightable, and the law is crystal clear on that, and there's no reason to debate that at this point.

And to the extent that these are allegations that are intended to -- if there's a future motion on -- motion for judgment on the pleadings on willfulness or something, it might be relevant, I don't know.  So I'm reluctant to strike simply because whether they should be in there or not, it is clear they're not legally relevant to the substance of the claim, and I'm not going to be influenced in that regard by their presence remaining in this Second Amended Complaint.

**MR. GRANNEMAN:**  I appreciate that, Your Honor.  The one thing I would point out are the authorities we cited on the idea of motions to strike being appropriate in circumstances where you can ferret out issues that are spurious and that are not, and that are going to expand the scope of issues, the scope of discovery in the case, or at least have the potential to do it, and this is just a late-in-the-game manufactured argument that we've got to scramble around here.

I think -- they had an opportunity to amend to allege the extra element of a UCL claim, and they failed to do it.  You gave them that opportunity, and you pointed out and said if you

can allege these things, then you can state a claim.  They have failed to do it.  So I just urge the Court to dismiss this claim with prejudice.  We'll proceed on the copyright claims.

**MR. NETA:**  I'll just speak briefly to that issue, Your Honor.  In response to your order, we took it very seriously, that's why we completely revised the UCL claim.  It looks absolutely nothing like it did in the First Amended Complaint.  It makes it quite clear that the UCL claim is predicated on misrepresentations, material misrepresentations, that NetSeer made to Microsoft and others about its technological capabilities.  And now we have testimony from NetSeer itself that it lacked those capabilities, so now we know definitively that NetSeer lied about its capabilities.  So we have those material misrepresentations, and that is all we need.  That is all we need in terms of an extra element to survive preemption by the Copyright Act.

**THE COURT:**  Okay.  Well, I will take it under submission.  But don't be surprised, number one, if I adhere to my ruling which I said about the scope of the copyright claims and what's limited in there.  I think I will take a closer look at the whole UCL question of -- I do have, you know, a question about whether or not it is in the end nothing more substantively than in substance a passing off claim.

**MR. NETA:**  And, Your Honor, I will simply invite the Court -- if so interested, I'm happy to provide the Court with

copies of every iteration of the Netseer code that was produced to us with highlighted sections demonstrating every line that was copied, to the extent that's instructive.  If the Court would prefer --

THE COURT:  Well, no, I think I'm going to judge the pleading based on what was submitted.

MR. NETA:  Understood.

THE COURT:  It's not a pro se case where, you know, people don't really understand the rules.  I think the rules are clear, so people are going to stand on what is pled, and I'm just going to have to make my ruling based on that.

MR. NETA:  Understood.  Thank you, Your Honor.

THE COURT:  Let me ask -- I know we have a CMC coming up in August.

MR. GRANNEMAN:  August 18th.

THE COURT:  August 18th.  And I just want to ask a preview.  What, in terms of ADR, because we've talked before about, you know, some project --

MR. GRANNEMAN:  We have a session scheduled with Judge Beeler on the 10th of August.  We have some -- we have a CMC statement due the following day.  There's a -- Mr. Neta and I had some communications the other day about his client, and I don't know whether there's going to be a request to change that day or not.

MR. NETA:  Yes.  Unfortunately, Your Honor, the client

representative has had a family emergency that he has to attend to on the 10th and is no longer able to fly from July the 10th. I asked him whether he's available on the 9th, and he said he was available on the 15th, but Mr. Granneman said that his clients were not available on the 15th.

THE COURT:  Well, I'd like for you all, if we have to move the CMC back a little bit, it makes sense to try to go to ADR first, and then we can gather afterwards to see where we're at.

MR. NETA:  I believe that makes sense.

THE COURT:  So if you need to, you know, continue the CMC for a week or subsequently, you could figure out a mutual date.  Because I know Judge Beeler's schedule is also -- you know, you've got to negotiate that as well.

MR. NETA:  Yes, sir.

MR. GRANNEMAN:  No, it's tight.  She's busy.

THE COURT:  Yeah, right.  I hope you can get to her.

So why don't you just let us know.  It makes sense to do the ADR and then come back.  That's how I had scheduled this thing.  So if we need to continue the CMC by a week or two or some short period of time so you can do the ADR first --

MR. GRANNEMAN:  Your Honor, could I just mention something in this context.  I'm happy to do that, and I think it's a good idea, but we have a time -- and I don't want to spend money on discovery at this point.  I'd rather devote

those efforts to the settlement conference.

THE COURT:  Right.

MR. GRANNEMAN:  But we do have a percipient discovery cutoff coming in October, and I really haven't done any discovery, and frankly don't want to, but if just raising this issue, if we could push that back 45 days or so.

THE COURT:  I'm amenable, you know, so long it doesn't change trial dates.

MR. GRANNEMAN:  No.  If we could just push the dates back for that.

THE COURT:  I think that makes sense, I'd rather --

MR. GRANNEMAN:  For expert disclosure.

THE COURT:  I don't want you to spend, that's why I did it this way.  I don't want you to spend yourself out of settlement.  And so if you need to push it back and stipulate, push it back, push everything back a couple of weeks or, you know, whatever you think is reasonable, as long as it doesn't impact the trial.

MR. NETA:  Right.  I couldn't agree more, as long as it doesn't impact the trial date.

THE COURT:  All right.  I'll look forward to your stipulation on that, and hopefully you could get a good mutual agreement with Judge Beeler and take advantage of her offices there.

MR. GRANNEMAN:  Okay.

**MR. NETA:**  Thank you so much.  Thank you for your time.

(Proceedings adjourned at 11:02 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Monday, August 15, 2016


_____

Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
Court Reporter